## 1850.   VEAL *v.* SECURITY MUTUAL LIFE INSURANCE COMPANY.

1. If the holder of a policy of life insurance sends to the company on the day the premium is due a check in payment thereof, and when the check is presented at bank payment is refused because of lack of funds to the credit of the drawer, the company, although it has delivered the premium receipt to the insured, may, by taking the proper steps, repudiate the transaction for the legal fraud resulting from the insured's having sent a check without having in bank the funds to meet it, and may enforce a lapse of the policy for non-payment of premium.  But if the company, in such a case, after notice that the check has been dishonored, retains it, and, instead of repudiating the transaction by returning the check and demanding back its receipt, insists upon the insured's paying it after the date on which the policy would otherwise have lapsed, a waiver of the punctual payment of the premium in cash results.  If the insurance company accepts and retains a note, check, or other interest-bearing obligation for the premium, the policy will not be held to be lapsed or forfeited for non-payment of premium, even though the note or other obligation is not paid at maturity, unless there is an express provision in the policy providing that a failure to pay any such obligation at maturity shall result in a lapsing or a forfeiture of the insurance.  Prima facie the liability to pay interest is regarded as the only penalty for failure to meet at maturity an ordinary indebtedness.

2. Where a policy of life-insurance provides that after three full premiums have been paid, if the policy should lapse for non-payment of a subsequent premium the insured should have the privilege within six months thereafter of surrendering the policy and taking his choice of a sum of money in cash, or a paid-up life policy for a slightly larger sum, or extended insurance for the full face of the policy for a stated term of years (the exact figures being set out in a table annexed), *Held, (a)* that the privilege so extended the insured is not a mere gratuity personal to the insured alone, but is a property right which on his death may survive to his beneficiary; *(b)* that so long as the person insured lives, time is of the essence of the contract, and his choice as to which option he will take must be exercised within the six months after a lapse occurs, or it

46

is ended as to him and as to the beneficiary; but if he dies after a lapse and before the expiry of the six months, time is no longer of the essence, as against the beneficiary; *(c)* that provisions of the policy relating peculiarly to the continuation of the insurance risk are inapplicable and immaterial when the policy has been converted into a death claim by the insured's having died; *(d)* that upon the death of the insured within six months of a lapse (in a case where the extended insurance would have run beyond that period) the beneficiary is entitled to hold and sue upon the original policy as a death claim against the company for the full amount of its face value.

.Action on policy, from city court of Atlanta—Judge Reid March 9, 1909.

Argued June 10,—Decided October 5, 1909.

*Moore & Pomeroy,* for plaintiff.

*Anderson, Felder, Rountree & Wilson,* for defendant.

POWELL, J.   On October 29, 1900, the insurance company issued its twenty-annual-payment life policy, insuring the life of John B. Veal in favor of his wife, the plaintiff.   In the face of the policy it was provided that the requirements and provisions contained in the pages which followed were conditions precedent, and were material parts of the policy.   One of the privileges so included in the terms of the policy is contained in the following language: "Privileges: That upon surrender of this policy while it is in force, or within six months after it may have lapsed, provided premiums have been paid for at least three full years of insurance, the company will give the insured the choice of either a cash value, extended insurance for the full face of the policy, or a paid-up life policy at the time of the lapse, as fixed in the following table.   The amount of cash value, paid-up insurance, or the time the insurance will be extended, shall be based upon the number of full years premiums that have been paid."   By the table, which is set out in extenso, the insured would have been entitled to demand, in case of a lapse at the end of the sixth year, $84 in cash, a paid-up policy for $300, or extended insurance for eleven years and two months.   One of the provisions of the policy is as follows:   "That to continue this policy in force, subsequent premium payments of forty-four dollars and ninety cents each shall be made to the company, at its home office, on or before the 29th day of October in every year for a period of 19 years."   Also: "If any premium shall not be paid on or before the date when due, this policy shall be null and void,

except as hereinafter provided." The policy allowed thirty days of grace for the payment of premium.

There is no contest over the proposition that six annual premiums were regularly paid. On November 28, 1906, within the period of grace allowed for the payment of the seventh premium, Mr. Veal sent to the company's authorized agent in Atlanta, a check for the premium, and the company's formal premium receipt was sent him. When the check was presented at bank it was protested for lack of funds to the credit of the drawer. On December 3, 1906, a date on which the right to pay the premium under the provisions of the policy as to thirty days of grace no longer existed, the assistant cashier of the insurance company wrote Veal as follows: "Your check for $33.68, dated November 28th, drawn on the First National Bank of Moultrie, Georgia, which you sent in to pay premium due October 29th, was duly placed by us for collection in our collection bank, and they returned the same to us to-day protested, and we have had to pay them $33.68 plus $1.50 protest fee, making a total of $35.18, for which you will please send us, by return mail, New York exchange or money order. When this is done we will return to you the protested check." Veal replied on the next day, stating that he had been out of town, and asking that the check be presented at bank again, and stating further that it would be paid together with the protest fee. On December 7 the assistant cashier replied saying that the check had been sent to the bank again, and asking him to call there and pay it. On December 26 the cashier wrote Veal another letter, telling him that his policy had lapsed for failure to pay the premium due October 29, but stating that they would be glad to entertain an application from him for reinstatement according to a blank enclosed. It appears that the foregoing constituted the entire correspondence on the subject, and that the check was not paid when it was sent back to the bank on December 7, but had been sent to the home office of the insurance company, where it was retained at the time suit was brought on the policy. Veal died on March 25, 1907. On March 30 a friend of the family of the deceased wrote the company, stating that at the request of the family he was asking for blanks on which to make proofs under the policy. The company replied on April 2, stating that Veal was not insured in the company; that his policy had lapsed. At the

conclusion of the evidence the judge directed the jury to find in favor of the defendant.

1.   Upon two distinct grounds we think that the trial court erred in deciding that the insurance company was not liable on the policy.   In the first place, at the time the insured died the company held in its possession, without ever having previously offered to surrender it, except on condition of its payment, the insured's check for the last premium due under the policy.   This check was the insured's fixed, certain, and unconditional promise to pay the sum named therein, bore interest at the rate of 7 per cent. per annum, was enforceable against him by suit at any time within six years, and was secured by a lien on the proceeds of the policy.   The insurance company's only right to hold it grew out of the fact that it was tendered in payment of the premium due October 29, 1906.   If it did not operate to pay that premium, or to create a waiver of a punctual payment thereof in cash, the company had no right to retain the check or to demand payment of it from the insured.   If the right of the insured to pay the annual premium were such an existing indebtedness against him that the company could have enforced payment otherwise than by his voluntary compliance, then the taking of the check would not, in the absence of an agreement to the contrary, have amounted to a payment of the indebtedness; for, in the case of an existing indebtedness, checks are not payment until they themselves are paid, unless there is an agreement otherwise. Civil Code, §3720; *Hall's Cotton-Gin Co.* v. *Black,* 71 *Ga.* 450.   Where a check or promissory note is given for a pre-existing debt, the transaction is not, however, wholly without legal incidents and effects.   Payment is not necessarily effectuated, but the creditor holds additional evidence that there is an indebtedness; and further, the rate of interest may be changed, and the time of the maturity of the debt may be extended.   In case there is no pre-existing debt, and the transaction between the parties is one that would otherwise be on a cash basis, and one party tenders a check and the other takes it and retains it, even after notice of dishonor, the necessary legal effect is that the check is held in lieu of cash. It is readily conceivable that in many cases a creditor, having the privilege of accepting the cash only, would prefer to hold the debtor's check (his promissory writing bearing 7 per cent. in-

terest) to rescinding the trade. In the case at bar, so long as the insurance company held Veal's check, he was absolutely liable to them for the principal and interest on it. How could the company consistently retain this liability against him, and still insist that his policy was void because the premium had not been paid in cash? It is important, too, to note that the policy contained no provision making the failure of the insured to pay at maturity any note or check taken in lieu of cash a ground of forfeiture. Compare McAllister v. New England Ins. Co., 101 Mass. 558 (3 Am. R. 404). The fact that it bore interest and was secured by lien on the proceeds of the policy is not without significance. See Arnold v. Empire Mutual Life Insurance Company, 3 Ga. App. 685 (2 a), 703 (60 S. E. 470); Insurance Company v. Bowes, 42 Mich. 19 (51 N. W. 962).

We fully recognize that, from the very nature of the transaction, insurance companies must have the right to insist upon the prompt payment of premiums, and, if they desire to do so, to insist that they be paid in cash. We have no inclination to disagree with the proposition announced by Mr. Justice Bradley in the Statham case, 93 U. S. 30 (23 L. ed. 789), and often quoted in other insurance cases, that "It must be conceded that promptness of payment is essential in the business of life-insurance. All the calculations of the insurance company are based on the hypothesis of prompt payments. They not only calculate on the receipt of the premiums when due, but upon compounding interest upon them. It is upon this basis that they are enabled to offer assurance at the favorable rates they do. Forfeiture for non-payment is a necessary means of protecting themselves from embarrassment. Unless it were enforceable, the business would be thrown into utter confusion." On the other hand, we recognize that well-managed insurance companies do not depend to any large extent upon forfeitures and lapses for the successful operation of their business; that it is frequently to their interest to waive forfeitures and to make advances to their policy-holders in order to discourage the discontinuance of the payments of premiums; also that they must earn interest on their funds, and that an interest bearing indebtedness held against a policy-holder, secured by lien on the proceeds of a policy which has an accumulated reserve to its credit, is frequently a desirable investment. They

have a right to insist that the premium be paid punctually in cash, but they have the right to waive this requirement and to extend payments, and to take notes or checks in lieu of cash; and when they accept the insured's obligation to pay, instead of insisting on the payment in cash, a waiver results, and they can no longer say that the premium has not been paid. This proposition is well recognized, but those caring to look up the authorities will find them well selected in the *Arnold* case, supra.

We would not be understood as saying that if a policy-holder sends a check in payment of his premium, and the company merely sends the check for collection, a payment of the premium results from this alone, if the check is dishonored. Commercial usage is to the contrary. If, when the company in the present case discovered that the check had been dishonored, it had within a reasonable time tendered the check back to the insured, it could justly have insisted that the policy had lapsed. It is no reply to say that the insured held the premium receipt. There should have been a tender of the check, with a demand for the return of the receipt. The receipt was only prima facie evidence of payment. But in this case the company allowed the insured to retain the premium receipt, and, even after the thirty days of grace had expired, demanded, not a rescission of the transaction and a return of the receipt because of the non-payment of the check by the bank, but that the insured pay the. check itself. It is plain, from the correspondence, that the company, through its cashier, even after the policy otherwise would have been lapsed, was treating the check as a valid enforceable liability against the insured. Having done so, the company's redress thereafter was by a suit on the check, or by holding it as a charge against the proceeds of the policy, and not by treating the policy as lapsed.

2. But for another reason the insurance company should have been held liable on the policy. Conceding, for the sake of argument, that the policy lapsed for the non-payment of premium due October 29, 1906, the six months within which the insured might exercise the choice, given by the policy, of taking cash, a paid-up policy, or extended insurance, had not expired when the insured died on March 25, 1907. Our attention has been chiefly invited by the briefs to the disagreement existing among the several American courts as to whether time is of the essence as to

the surrender of the policy and a demand of the cash, or paid-up policy, or extended insurance as the case may be, and as to whether the option given can be exercised after the time named in the policy,—in this case six months; but we have no direct concern with that question. Those desiring to investigate it can look with profit to the case of Lenon *v.* Mutual Life Ins. Co., 80 Ark. 563 (98 S. W. 117, and the monographic note appended to the report of it in 8 L. R. A. (N. S.) 193). This is a different case. The insured died and the policy became a death claim before the six months expired. The fatal dénouement came before the day of choice was ended, and stripped the matter of all opportunity of choice; for what sort of an election is there as to whether one will take $84 cash, $300 paid-up insurance, or $1,000 (and increments) extended insurance, when the insured is dead and the policy is a death claim? To speak of choice or election under such circumstances is to indulge in utmost absurdity.

The contention of the insurance company is, that, the policy having lapsed for non-payment of the annual premium, it was dead and subject to revival only upon strict compliance by the insured personally with the pre-requisites prescribed in the policy; that an affirmative express election between the options was in all events necessary; that no one but the insured himself could elect, and that he having died without expressing a choice, all rights under the policy were forever ended; that an express surrender of the policy was also a vital and indispensable condition; that all of these things must have been strictly and literally done within six months, for that as to all of them time was of the essence. Such language as that found in this policy and quoted in the statement of facts is not ordinarily adequate to invest a contract with any such harsh incidents; and it would be just to indulge so strict a construction as that contended for only where the circumstances are such that to give the language a more liberal construction would bring about results not fairly within the contemplation of the parties.

Let us look to the nature of the transaction itself for light as to the meaning of the provisions of the contract. In the first place, the privileges accruing to the insured in the event of his failure to pay the premium promptly were not a mere gratuity tendered him by the company out of excess of liberality. The

company had been collecting out of him and holding in reserve against the maturity of his policy a sum of money in excess of what would have been the actual cost of carrying the risk of his dying during the particular term of years throughout which the premiums had been paid. This reserve was fairly his, and the insurance company held it in the nature of a trust fund for him. If it became forfeited to the company for any reason, the company had that much of his money without having given him anything in return. The law of the State where this company had its home office forbade the absolute forfeiture of this reserve as the result of the mere failure of the insured to pay the annual premium, and the privileges stipulated in this policy merely represent options which the law itself required the company to give the insured as a quid pro quo for his money which they held in the nature of a trust. There is no reason, therefore, why the option should be construed as having been a privilege so peculiarly personal to the insured that it could have been exercised by him alone and not also by the beneficiary who, by reason of the death, succeeded to all survivable rights conferred by the policy.

Since two of the privileges related to insurance, and since the hazard which arises from an uncertainty as to the time when the particular death will happen is the controlling factor in insurance, it became necessary for the company to fix a time within which the choice among the options conferred by the policy should be exercised. The policy fixed the time at six months from the date of the lapse—a very reasonable period. "Time is not generally of the essence of the contract; but by express stipulation or reasonable construction it may become so." Civil Code, §3675. There is no express stipulation in this contract making time of the essence, but we think that reasonable construction would require a holding that if the insured had survived the lapse for more than six months, his right of choice would have expired. See Knapp v. Insurance Co., 117 U. S. 411 (6 Sup. Ct. 807, 29 L. ed. 960). Whether after that time it would have been the duty of the company to elect and to tender him one of the privileges is a point upon which the courts have divided, and we are not now called upon to take sides in that controversy. The nature of the options was such in the case at bar that the material object to which the parties looked in the conception of the con-

tract would have been defeated if the insured could have left the insurance company in doubt beyond the six months as to which of them he would choose, whether he would take his reserve in cash, or in a small policy payable whenever he should die, or in a larger policy payable if he should die within a stipulated term of years. To this extent it would be fair to say that time was of the essence of the contract.

But as was pointed out in the Lenon case, supra, if there is no option to be exercised at the end of the six months—if there is no election between two or more diverse hazards, but the nature of the demand upon the company is fixed and single, it would be contrary to the ordinary canons of construction to hold time to be of the essence of the contract.

When, in the case at bar, the insured died the demand surviving to the beneficiary did not partake of that diversity and did not require that necessity for choice which existed under the three privileges open to the insured during that portion of the six months period as to which he survived. The beneficiary's demand was fixed and single. She would undoubtedly demand the full amount. The new element which had been injected into the matter—the death of the insured and the end of all the uncertainty which formerly was involved in his expectancy of life— had produced a cancellation of all the elements of choice. A fixed unconditional right to demand a greater rather than lesser sum of money in settlement of the same claim is not in the eyes of the law a case of choice or election. There was absolutely no reason, growing out of this portion of the contract, why the beneficiary should notify the company prior to the expiry of the six months period that she would claim the full amount. A failure to do so could in no wise change the nature of the demand or give one of the parties any unfair advantage over the other. As to this, therefore, time was not of the essence of the contract.

Her privilege not being uncertain or contingent, there is no reason for construing the language of the contract to mean that she should exercise it promptly to the day or not at all. Her right was to claim money only, and not to exercise a choice between money and one or more forms of insurance. The requirement upon her was to treat the policy as a death claim, to make proof within a reasonable time, and, if the company refused pay-

ment, to sue within the limitation prescribed in the contract. The only limitations as to time applicable to her were those stipulated by the policy as to its collection in the event it became a death claim.

The briefs cite cases pro and con as to the effect of the limitation appearing at the beginning of the privilege clause of the policy, "that upon *surrender* of this policy," etc. None of them present a state of facts like this. They relate to cases where the insured lived. Provisions in a policy relating to the continuance of the insurance risk thereunder are not, in the main, further applicable, when the policy has been converted into a death claim. For example, it is stated in unqualified terms, as one of the conditions of the policy before us, "That to continue this policy in force, subsequent premium payments of $44.90 each shall be made to the company at its home office on or before the 29th day of October in every year for a period of 19 years." There is no express suggestion that the payment of future premiums is to cease upon the death of the insured. Yet who would contend that further payments could be demanded after the policy became a death claim? So, if the insured had desired to take his reserve in cash or to exchange the twenty-payment policy for a paid-up policy, or perhaps to exchange it for a term policy representing the extended insurance allowed (though a close reading of the provision before us makes us doubt that it was ever intended that the insured should surrender the old policy and take a new one in the event he chose the option as to the extended insurance), a surrender of the policy would be proper and, unless excused for some good reason, necessary; for that is a requirement apposite to those transactions. On the other hand, such requirement would be senseless after the policy became a death claim. We are sure the parties did not intend to contract for so useless and absurd a thing as that the beneficiary, upon the death of the insured during the period in which the options were open, should, in order to collect the full and highest amount any of the options would give, sit down and notify the company that she had chosen the option as to extended insurance and that she should surrender the old policy and demand a new one for a term of eleven years and two months; and then when the company had issued a new policy on the life of a dead man (sic), she should make out the proofs of death

under the new policy. The absurdity is palpable. Undoubtedly the parties understood that if the death of the insured occurred before the policy had been surrendered in exchange for the cash or a new contract, the proofs of death should be made under it. If this is not said in so many words, it is plainly to be understood from all the circumstances of the transaction; no other construction would be just or natural. In but few, if in any, contracts of whatever character are all the terms and incidents expressly set forth; but the law recognizes and enforces unwritten terms understood to be a part of them from necessary implication. Considering the circumstances of the transaction, the object and nature of the contract, and the reasons inducing its several provisions, we construe the provision before us, by what we consider the implication necessary to effectuate the true intent of the parties, to mean that if the insured died within six months of a lapse of the policy after three full premiums had been paid, it should become a death claim in favor of the beneficiary for the full amount of the policy. Of the intermediate propositions which we have merged into this final conclusion the only one of which we have the slightest doubt is the proposition that the provision of the policy conferring the options on the insured created such a property right under the contract that upon his death it survived to the beneficiary. The cases of Nielson v. Provident Assurance Society, 139 Cal. 332 (73 Pac. 168, 96 Am. St. R. 146), and Wheeler v. Connecticut Ins. Co., 82 N. Y. 554 (37 Am. R. 594), hold that the right in such cases survives to the beneficiary; while the case of Balthaser v. Illinois Ins. Co. (by the Kentucky Court of Appeals, but not officially reported), 110 S. W. 258, apparently holds to the contrary; but that is a very peculiar case on its facts. Counsel in their briefs have made a rather copious citation of cases, apparently supporting the pros and cons of the different propositions in this case, but the fact is that the language adopted in their policies by the various insurance companies is so diverse that almost every case stands upon its own peculiar facts and is incapable of any great extension as precedent in other cases. The safest, surest guide in each case is usually an unstrained application of the well-recognized canons of construction by which courts are wont to interpret contracts generally.

*Judgment reversed.*