24637.   UNION CENTRAL LIFE INSURANCE COMPANY *v.*
MERRELL.

DECIDED MARCH 4, 1936.   REHEARING DENIED MARCH 14, 1936.

*A. S. Clay, Harold Hirsch, Marion Smith, Hamilton Lokey,
Sidney Holderness,* for plaintiff in error.

*Boykin & Boykin,* contra.

GUERRY, J.   The Union Central Life Insurance Company issued
a policy of insurance in the sum of $4000 to Jesse M. Merrell Sr., on
January 26, 1917.   Premiums of $112. 96 were paid annually there-
on until January 26, 1933, when default occurred.   The insured
had obtained a loan for the full amount possible under the terms
of the policy.   The policy contained the usual clause giving 31
days of grace, and under its terms it became forfeited on February
27, 1933.   In the policy it was provided that premiums were pay-
able annually in advance at the home office or to an authorized
agent of the company on delivery of a receipt signed by the presi-

dent or secretary, and countersigned by such agent. It was therein further provided: "This policy will be reinstated at any time within three years from the date of the lapse, provided it has not been surrendered, on evidence of insurability satisfactory to the company, and upon payment of past-due premiums with interest, and the payment or reinstatement of any indebtedness due hereon." And further: "None of the terms of this policy shall be modified, nor any forfeiture under it waived, save by an agreement in writing, signed by the president, vice-president, or secretary or assistant secretary, whose authority for this purpose shall not be delegated." From the evidence it appears that Thomas H. Daniel had been the general agent of the company for the State of Georgia since 1917, that all premiums of the agency in Georgia were collected under his supervision, and that all applications for reinstatement were submitted by him to the home office, and all receipts for premiums paid were countersigned by him. On March 7, 1933, Daniel wrote to Jesse M. Merrell Sr. a letter referring to his policy which had lapsed for non-payment of premiums, as follows: "The premium amounts to $112.96, less dividend of $21.33, making a net premium of $91.63. We would suggest that you change the payment of this premium to the quarterly basis, as on this basis the premiums would amount to $29.68 less dividend of $5.33, making the amount due at this time $24.35. It will also be necessary for you to fill out and sign the attached application for reinstatement and return to this office, together with P. O. money order for $24.35 covering the net quarterly premium." On May 1, 1933, Merrell filled out the application for reinstatement and sent it to Daniel, together with his check for $24.35, and was notified that $ .25 additional interest was due, which also was sent, and this check was indorsed by the Union Central Life Insurance Company and was cashed and placed to its credit in an Atlanta bank. There was evidence that a regular receipt on the company's form, signed by its executive officers and countersigned by Thomas H. Daniel, was sent to the insured. The records of the company introduced in evidence showed that the policy was credited with payment of $24.60 in cash and $5.33 in dividends on May 10, 1933. The insured died suddenly May 21; and on May 26, before the insurer learned of his death it declined to reinstate the policy and sent a check for $24.60 payable to the deceased. This check was never

cashed. The wife of the insured, the beneficiary under the policy, filed this suit to recover the face value thereof, less the amount of the loan. The insurer answered that under its terms there had never been any reinstatement of the lapsed policy, that the application for reinstatement was declined before the company learned of the death of the insured, and that the insured made misrepresentations as to his health in the application for reinstatement.

It becomes pertinent to consider whether under the terms of the policy the general agent of the company for the State of Georgia had authority to modify the terms of the policy by changing the premium from an annual to a quarterly payment, and whether, if this were done without authority, there was a ratification of the agent's action by the company. It may not be disputed that under the provisions of the policy such agent did not have such an authority, and that the insured had notice of the limitation of such authority by the terms of the policy itself. An agreement made by such agent so to modify or change the terms would not be enforceable. *Reese* v. *Fidelity Mutual Life Association,* 111 *Ga.* 482 (36 S. E. 637); *Thurmond* v. *Sovereign Camp W. O. W.,* 171 *Ga.* 453 (155 S. E. 760), and cit.; *Hutson* v. *Prudential Insurance Co.,* 122 *Ga.* 847 (50 S. E. 1000). In the *Hutson* case the policy became lapsed, and an agent who held himself out as a general agent of the company issued a receipt for one half of the premium, which he said he would "forward to company and get company receipt." This was never done, and no application for reinstatement was ever made. Such an agreement by an agent, unless ratified by the company, can not be the basis of a suit. While it is true that even a general agent ipso facto has no authority under the terms of this policy to modify, change, or waive the terms of this contract, another question is presented when it is shown that such general agent has express authority to collect premiums and issue receipts, and where it further appears that such premiums so collected have been immediately accepted by and placed to the credit of the insurer by an authorized agent, and the company's regular receipt issued therefor, which receipt is signed by the company's officers and countersigned by the general agent. The clothing by the company of such agent with the right to issue such receipts so signed by its regularly constituted officers, and the actual signing and delivery of such a receipt, amounted to a ratification by the company of the act of

the general agent in changing the terms of payment to a quarterly basis. An agreement made by such agent to change, modify, or waive the conditions of the policy, where his authority so to do is limited by the terms of the policy itself, is not enforceable as against the company. It becomes another matter, however, where such agent is given express authority, by giving him what are in effect blank powers of attorney, by the delivery to him of receipts signed by the duly authorized and empowered officers of the company, which receipts authorize the agent to countersign and deliver them. Such action is as much a waiver of the conditions of the policy as if it had been performed by the president or secretary or other duly empowered officer. In the *Hutson* case, supra, the agent merely gave his personal receipt for the money paid, and stated therein that he would get the regular receipt from the company. In *Massachusetts Benefit Life Association* v. *Robinson,* 104 *Ga.* 256 (30 S. E. 918, 42 L. R. A. 261), it was said: "As a general rule, the receipt by the insurer of the premium after maturity is a waiver of forfeiture which would otherwise take place; and this is true even though the payment be made to an agent of the insurer, who does not disclose to his principal when transmitting the amount collected that it has been paid by the insured after the premium was due. Bliss on Life Ins. § 194." In *Georgia Masonic Mutual Life Insurance Co.* v. *Gibson,* 52 *Ga.* 640, it was held that where a policy is forfeited because of non-payment of premiums when due, and subsequently the insured sends in the amount due, which is retained by the company without objection, such conduct amounts to a waiver of the default. See also 3 Couch on Ins. §§ 687, 688; 4 Cooley's Briefs on Ins. (2d ed.) 3796; *Veal* v. *Security Mutual Life Insurance Co.,* 6 *Ga. App.* 721 (65 S. E. 714); *Kelley* v. *Carolina Life Insurance Co.,* 48 *Ga. App.* 106 (171 S. E. 847); *Piedmont & Arlington Life Insurance Co.,* v. *Lester,* 59 *Ga.* 812.

The acceptance by the company of the past-due premium and interest thereon to date of payment, and the issuance of its receipt therefor, and the retention of such sum until after the death of the insured, where no question of fraud is involved, amounts to a reinstatement of the policy. In the present case the premium for the reinstatement for a definite length of time was paid. The agent of the company who had the power to collect accepted such payment, and the agent having power to issue such receipt properly

issued and delivered the same. It is not shown by the evidence that such acceptance was conditional, although the company had the privilege at the time of refusing to reinstate for lack of insurability. In Couch on Insurance, § 1369, it is said: "If an agent authorized to make insurance contracts represents to the insured that his policy is renewed, and accepts and appropriates money paid over under such belief, the company is estopped to deny the renewal or extension." The acceptance of premiums after default does not create a new contract, but merely continues the binding effect of the original policy. A contract for the reinstatement of a life policy is not a new contract; rather it is merely a waiver of forfeiture, so that the orginial policy is restored and made as effective as if no forfeiture had occurred, unless the contract of reinstatement be tainted with such fraud as would justify the company in repudiating it. See Cooley's Briefs on Insurance, 3800. The defense of misrepresentation was not substantiated by evidence. No reversible error is disclosed in the exceptions to the rulings on rejection or admission of testimony. The exceptions to the statement of the contentions of the parties by the court in the charge to the jury disclose no ground for reversal. Without a request so to do, it is not error for the judge to fail to charge that a receipt is only prima facie evidence of payment. Complaint is made that the court failed to charge the jury on the question of the good health of the deceased at the time he made the application for reinstatement, it being alleged in the answer that said application contained misrepresentations in reference to the health of the insured at the time he made the application. The question in the application was: "Have you been ill or injured or employed a physician or surgeon within the last twelve months? Answer yes or no." The deceased answered: "No." There was no evidence that this was an untrue statement, and it was not error to fail to submit such issue made by the pleadings but entirely unsustained by the evidence. There was no error in overruling the motion for new trial.

*Judgment affirmed. Sutton, J., concurs. MacIntyre, J., dissents.*

MacIntyre, J., dissenting. I can not, after careful consideration, agree with the majority opinion. As I view the case, the burden of proof rested upon the plaintiff to prove that the policy had been reinstated, or the provisions in that regard waived, in

accordance with the allegations of her petition. It is undisputed that the policy became lapsed on February 27, 1933. This much is admitted by the majority opinion. Under the terms of the policy it could be reinstated at any time within three years from the date of the lapse, provided it had not been surrendered, on evidence of insurability satisfactory to the company, and upon payment of past-due premiums with interest, and the payment or reinstatement of any indebtedness. As stated in the majority opinion, on March 7, 1933, the general agent of the defendant wrote to the insured a letter referring to his policy which had lapsed for non-payment of premiums, and suggested that he change his premium from an annual to a quarterly basis, saying further: *"It will also be necessary for you to fill out and sign the attached application for reinstatement* and return to this office together with P. O. money-order for $24.35 covering the net quarterly premium." On May 1, 1933, the insured complied with the requirements of Daniel's letter. The check sent by the insured was, however, insufficient to cover the quarterly premium; and on the day his check and signed application for reinstatement were received, the insurer, through its agent, wrote to the insured of this fact, and on May 10, 1933, the insured mailed to the insurer the additional amount. The insured died on May 21, 1933. The insurer on May 25, wrote to the insured, notifying him that his application for reinstatement was rejected, and returned his premium. *There is no dispute that at the time of its refusal to reinstate the insurer had no notice of the death of insured.* I do not think it can be disputed as good law that if the insurer had taken no further action in the matter, that is, had done nothing but receive and retain the check and application for reinstatement, the only question that would have presented itself would have been whether a reasonable time had elapsed in which the insured should have taken some action in the matter, thereby making the policy reinstated; and since only eleven days had elapsed, it may be that this issue should, as a matter of law, have been found against the insured. The *check* sent by the insured was certainly recognized both by the insured and the insurer to be conditional on *its approval of the application for reinstatement,* for the insured mailed the check along with the application for reinstatement.

However, we have the further, very vague, testimony of the insured's son, as follows: "I had that receipt at that time, and showed it to Mr. Hanserd after my father died on Sunday; that was Tuesday. That receipt looked like the usual receipt, it was countersigned by Thomas H. Daniel. Looking at this old receipt [indicating], it is very much similar to the receipt received, possibly the same one signed it. It was signed by an officer of the company, secretary or president. . . This receipt I have testified was similar to the receipt I hold in my hand, was a receipt in the amount. If I am not mistaken it was issued for $29.58, something around there, 29 and something. . . Just from observation I knew it was an ordinary receipt. I saw it when it was received, and another occasion when Mr. Hanserd was down there. I saw it when my father received it. . . I saw it when Mr. Hanserd was there, and I showed it to Mr. Hanserd, and I have never seen it since that time. To my own knowledge that is all the times I saw the receipt. I have testified this printed receipt bore the signature of officers of the company on it. I do not recall the title. I am not sure, I think he was secretary though, and the signature of the agent too. That receipt was similar in some respects to the receipt which I hold here, except as to the amount. It is the same type of receipt. I could not say as to the printed language. I wouldn't say that it is the exact language, conveys the same idea that the premium had been received and accepted." The very best that can be said for this testimony is that it shows that the insurer sent a receipt for the money. It is nowhere testified that it was unconditional, or that it contained any statement that the policy was reinstated. This fact alone would appear to me to be sufficient to defeat the action; but assuming that it did show that it was a general receipt for the premium, I think the circumstances of the transaction, plus the uncontroverted evidence on the part of the defendant, clearly shows that there had not been any reinstatement of the policy; and under the principle which is well expressed by Cooley (4 Briefs on Insurance, 3797-8), that "the mere receipt of the amount for which the insured was delinquent is not a waiver, if the *insurer by reservation or otherwise* indicates unmistakably an intention to insist on the requirement as to good health," a verdict for the defendant was demanded. See also 3 Couch on Insurance, § 688 notes 3, 5, 6.