## No. 11,479.

FIRST STATE BANK OF BRANDON *v.* KOHL, ET AL.

Decided June 21, 1926.

Action in replevin. Judgment for plaintiffs.

*Affirmed.*

*On Application for Supersedeas.*

1. SALES—*Payment.* Checks given in payment for corn by a grain company, which are dishonored by the bank, do not constitute payment.

2.     *Payment—Presumption.* The presumption is that checks given for the purchase price of corn were not received as payment thereof.

3. PAYMENT—*Checks.* The presumption, that checks were not received as payment for corn, is made conclusive by the fact that the seller understood that he was to be paid for it on delivery.

4. SALES—*Title.* The buyer of goods obtains no title thereto when he violates his promise to pay for them on delivery.

5.     *Bill of Lading—Purchaser.* A bank discounting a bill of lading to corn in possession of the buyer, who failed to pay for same, acquired no greater rights than the buyer had in the property.

6.     *Possession.* The bare possession of goods does not clothe a person with power to dispose of them as the owner,

7.　　*Notice.* In a replevin action, evidence reviewed, and held that a
bank, taking a bill of lading for corn from the purchaser with knowl-
edge that checks given in payment therefor had been dishonored,
was put upon inquiry as to other facts, under which it acquired no
interest in the property as against the seller.

*Error to the District Court of Cheyenne County, Hon.
Arthur Cornforth, Judge.*

Mr. JOHN H. VOORHEES, Mr. JAMES C. LANG, for plain-
tiff in error.

Mr. V. H. JOHNSON, for defandants in error.

*Department One.*

MR. JUSTICE ADAMS delivered the opinion of the court.

DEFENDANTS in error, Kohl, Burke, Nelson and Foulke,
plaintiffs below in four separate cases against First
State Bank of Brandon, and Union Pacific Railway Com-
pany, recovered judgment in replevin for certain shelled
corn. The four suits were consolidated for trial. They
are brought to us for review on writ of error, at the
instance of the bank, and a supersedeas is asked for.
The railway company was a defendant below, but is not
before this court.

Except as otherwise noted, the facts in the four cases
are substantially the same. The persons and corpora-
tions hereinafter discussed, whether parties to the suit
or not, are: (1) The four plaintiffs above named, herein-
after called the farmers; (2) the above bank, defendant
in the four suits; (3) W. J. McNeil, president of the
bank; (4) The Rooks-Fehr Grain Company, hereinafter
called the grain company; (5) Bowman, local buyer and
general manager for the grain company; and (6) Mit-
chell, employed by the grain company. The case in this
court is between the bank and the farmers. The others

just mentioned, McNeil, the grain company, Bowman and Mitchell, are not parties to the suit.

McNeil did all of the work of the bank, official and clerical. It was known as a "one man bank." McNeil was posted on local conditions.

The grain company bought and sold corn. It was a customer of the bank—had a checking account there, sometimes with a large balance to its credit, and sometimes with its account overdrawn. It owed the bank, and McNeil was endorser for it, or for Rooks, a member of the company, on a debt to a third person. The bank had an intimate acquaintance with the grain company's affairs and with its methods of buying and selling grain.

Bowman, upon behalf of the grain company, transacted most of its local business with the bank and the farmers. He was authorized to sign company checks on the bank.

The farmers raised corn on their several places, and Bowman, for his company, went around among them, buying their shelled corn, and agreeing with all of them to pay cash therefor. To two of the farmer plaintiffs, Bowman gave the grain company's checks on the bank for the agreed price to be paid for the corn. To the other two farmer plaintiffs, he gave no checks, but told them the money was waiting, and agreed to pay for the corn, cash on delivery, but failed to do so.

Pursuant to arrangement, all corn was delivered to the railway company at one of its local stations, and a bill of lading made out, in the name of the grain company, and delivered to the latter.

Very shortly after the above happenings, on the morning of a certain day, McNeil, on opening the bank's mail, found two of the grain company's checks, given for the corn. He refused payment, account no funds. The grain company had given many checks in payment for its corn purchases, and McNeil admitted that he knew that the checks were in nearly all cases drawn in payment for corn bought by the company in Cheyenne county, where

plaintiffs lived. He also admitted that he knew that the bill of lading represented corn purchased by the company in that county. In the afternoon or evening of the same day that the bank turned down the company's corn checks, for lack of funds, one Mitchell, employed by the grain company, brought the bill of lading to McNeil in the bank. A draft was taken drawn on another business house in Denver, the bill of lading attached thereto, and McNeil for his bank, discounted the draft, and applied the proceeds to the grain company's checking account. This account was considerably overdrawn; that is, the bank chose to honor some of the company's checks, whether it had funds or not, but it did not choose to honor the checks in question, given by the company to the farmers for their corn. McNeil dispatched the draft and bill of lading to Denver the same night, by special delivery letter for collection, but the draft was not paid, the Denver house having scented or having been advised of trouble in the meantime. McNeil made other efforts to realize on the bill of lading, but was unsuccessful.

It is claimed that McNeil had taken a mortgage on some of the corn in Cheyenne county, about the same time that he commenced to refuse payment on the checks. His right, however, to apply any money on the mortgage is not in issue, for he did not so apply it in reduction of the mortgage, but put it in the company's checking account, giving as a reason that there was enough other corn to satisfy the mortgage, and that he wanted the company to be able to go on with its business.

As a result of the above, the bank got the corn, and the farmers, who had agreed to sell it for cash to the grain company, got nothing. In the replevin suits, the court awarded the corn to the farmers, with costs against the bank.

The legal questions are:

1. Did the two checks given by the grain company, and dishonored by the bank, constitute payment for the corn? The answer is: No., you cannot buy good corn with bad checks.

The presumption is that the checks were not received in payment. *Peterson v. First State Bank of Hillrose,* 79 Colo. 494, 246 Pac. 784; *Larsen v. Breene,* 12 Colo. 480, 483, 484, 21 Pac. 498; *Edwards v. Harvey,* 2 Colo. App. 109, 111, 29 Pac. 1024; *First National Bank v. Newton,* 10 Colo. 161, 171, 14 Pac. 428; *Lomax v. Colo. Nat. Bank,* 46 Colo. 229, 237, 104 Pac. 85; *Globe Company v. Taylor,* 61 Colo. 430, 440, 158 Pac. 717.

The presumption that the checks were not received in payment, is made conclusive here by the fact that the farmers were promised, and they understood that they were to be paid for the corn on delivery. They did not agree to accept waste paper for cash. The buyer did not acquire title.

2. In a sale of goods to be paid for on delivery, when the seller delivers but the buyer violates his promise to pay, does the buyer acquire title? Answer: No; the worthless promises were no better than the bad checks. No credit was extended, nor was it so intended. Title to the corn remained in the seller.

3. Did the bank, by discounting the bill of lading, acquire any greater rights to the corn than the grain company? Answer: No. "The bare possession of goods does not clothe a person with power to dispose of them as the owner. Levi v. Booth, 58 Md. 305–314, 42 Am. Rep. 332." *Silberfeld v. Solomon,* 70 Colo. 413, 416, 202 Pac. 113.

In the instant case, the evidence, which we do not consider necessary to relate at greater length than the above—particularly in view of the testimony of McNeil himself, president of the bank—was apparently quite satisfactory to the trial court that the bank took the bill of lading for the corn with its eyes wide open. It is also manifest that the bank knew that in two instances, a part of the corn represented by the bill of lading was bought with the same checks that the bank itself had dishonored on the same day. It was put on inquiry as to other facts, and also knew, as McNeil testified, that the corn came

from Cheyenne county farmers and that these were corn checks. His unusual haste, in his unsuccessful effort, with a special delivery letter, to get the Denver house to cash the draft with the bill of lading attached, instead of employing the regular channels of the mails—this and other circumstances, afforded the trial court illumination as to the facts upon which it based its judgments in the four consolidated cases.

We do not find it necessary, nor do we consider it proper to make any announcement of what the legal rights of the parties would be under any state of facts other than the ones recited. Our conclusion is that the bank was the author of its own troubles. In each of the four cases, the supersedeas will be denied and the judgment affirmed.

Mr. Chief Justice Allen and Mr. Justice Burke concur.