### 25082. WINTON *v.* BUTLER.

DECIDED MAY 1, 1936. REHEARING DENIED JULY 23, 1936.

*S. P. Cain, H. H. Merry,* for plaintiff in error.
*Hay & Gainey,* contra.

GUERRY, J. J. N. Butler brought a bail-trover action against Hense Winton, for recovery of sixteen mules of the alleged value of $2000. Winton was served while within the jurisdiction of the court. On the trial a money verdict for $1600 in favor of Butler was returned. Writ of error was brought to this court on

the order of the judge overruling the defendant's motion for new trial.

The evidence shows that the plaintiff was a mule dealer, and that he went to the defendant at Dechard, Tennessee, and bought from him 105 mules for $13,989, and had them shipped to Ragsdale-Lawhon & Weill Company, at Atlanta, Georgia, and gave in payment therefor five drafts on Ragsdale-Lawhon & Weill Co., aggregating said amounts. The evidence discloses that the defendant bought and paid for the mules in Tennessee, and then sold them to the plaintiff for a profit of $2.50 for each mule bought, and the drafts drawn covered the purchase-price paid by the plaintiff for the mules and the $2.50 profit for his trouble in buying. Ragsdale-Lawhon & Weill refused to pay the drafts, and notified both the plaintiff and the defendant. The defendant then came to Atlanta, and Ragsdale-Lawhon & Weill turned the mules over to him. He sold 88 of them, one was crippled, and sixteen were left. These sixteen were sold later by the defendant, and are the mules for which this action in trover was brought. The mules so sold by the defendant in Atlanta lacked nearly $1200 of bringing as much as was paid for them by the defendant in Tennessee. Of the 88 mules, 18 had been sold by Ragsdale-Lawhon & Weill before either the plaintiff or the defendant reached Atlanta. The plaintiff testified that he did not agree for Ragsdale-Lawhon & Weill to turn over the mules to the defendant, nor did he agree for the defendant to take charge of them and sell them. He further testified: "I have never paid the defendant for any of those mules except with those drafts. . . I was out no money, except my expenses." The defendant sold the mules before the drafts ever reached Atlanta. Both the plaintiff and the defendant were notified by Ragsdale-Lawhon & Weill that the drafts would not be paid. The defendant "was out $13,000 worth of mules. If he had helped me, we would have collected that. He came and got into the show. I did not want him to try to collect out of me. He was entitled to collect out of Ragsdale-Lawhon & Weill, the Atlanta firm." The sixteen mules for which this suit was brought were the ones that were put into a pen to themselves at the time the others were sold. The defendant testified that the mules were sold for cash. "I did not agree to give him any time to pay for the mules, longer than the drafts could get to Atlanta." The de-

fendant also testified that he and the plaintiff agreed that they would sell as many as they could in Atlanta. "I told Butler the sixteen mules left would eat their heads off, and he also agreed that it was best to sell them. The plaintiff still owes me $1100 on the purchase-price." This amount represented the difference between what the plaintiff agreed to pay and the amount received by the defendant when the mules were sold for his benefit. The defendant still had the drafts and produced them on the trial.

Under the evidence the title to the mules had never passed out of Winton. It is nowhere shown that any credit had been extended, but on the other hand every indication is that the sale was a cash sale. Under the Code, § 96-106, unless credit is specifically agreed upon, or is the custom of the trade, the purchase-money is due immediately, and the seller may demand payment before delivering the goods. In *Sims* v. *Bolton,* 138 *Ga.* 73 (74 S. E. 770), Bolton sold to Sims a mule for $60. Sims gave Bolton a check for this amount. Payment of this check was refused on presentation to the bank. Bolton brought an action in trover against Sims to recover the mule. The court said: "This being a cash transaction, and the check given for the purchase-price of the mule not being paid by reason of instructions of the drawers of the check to the bank, the title to the mule remained in the vendor, and never passed to the vendee. Merely giving the check was not a payment in cash, and there is no evidence that it was to be accepted by the vendor as cash; and therefore it can not be so considered until paid. . . Nor was the mere possession of the unpaid check such an acceptance by the vendor as amounted to a cash transaction, in the absence of an express agreement that it should be treated and accepted as cash." See also *Owens* v. *Jones-Kennedy Furniture Co.,* 28 *Ga. App.* 317 (111 S. E. 86) ; *Chafin* v. *Cox,* 39 *Ga. App.* 301 (147 S. E. 154) ; First State Bank of Brandon *v.* Kohl, 79 Colo. 620 (247 Pac. 571). In *Chafin* v. *Cox,* supra, it was said: "Where personal property is delivered to another under an agreement that he is to pay cash therefor, and where the cash payment is made by check, which the person receiving believes to be good, but which afterwards proves to be worthless, no contract of sale arises, and no title to property passes." In *Stewart Paper Mfg. Co.* v. *Rau,* 92 *Ga.* 511 (17 S. E. 748), it was said: "Drafts are not payment until they themselves are

paid, there being no evidence that they were taken expressly in payment." See also *Kinard* v. *First National Bank of Sylvester*, 125 *Ga.* 228 (53 S. E. 1018, 114 Am. St. R. 201). The retention of the draft by the vendor in the present case did not put the title to the mules in the vendee or give to him a cause of action in trover. *Livingston* v. *Epsten-Roberts Co.*, 50 *Ga. App.* 26, and cit. In the present case, title to the mules had never passed out of Winton until the draft given in payment therefor had itself been paid. This was not done. The parties on whom the draft was drawn refused to pay it, and turned the mules over to Winton. He had title and we can not see, under any theory of the case, how title to the mules ever has passed to plaintiff. In view of what is here ruled, it becomes unnecessary to discuss the other grounds of complaint. It was error to overrule the motion for new trial.

*Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*

ON MOTION FOR REHEARING.

That the draft in this case was held by Winton, under the facts of this case, does not alter the rule. In *National Benefit Life Ins. Co.* v. *Brown*, 41 *Ga. App.* 741 (154 S. E. 469), it was said: "Under the ruling . . in *Veal* v. *Security Mutual Life Ins. Co.*, 6 *Ga. App.* 721 (65 S. E. 714), the retention by an insurance company of a dishonored insurance-premium check, coupled with a claim of liability thereon as against the insured, amounting to a claim of ownership of the check by the company, will constitute an acceptance of the check as in payment of the premium, such as will prevent a forfeiture of the policy. *The reason for such a variance from the general rule* [italics ours], that checks are not accounted payment until they themselves are paid, is based upon the fact that no obligation rests on the insured to pay the premium, other than that such payment constitutes a condition precedent to his maintenance of the policy, and that upon a tendered check being dishonored the company may elect either to treat the premium as unpaid and the policy as lapsed, or, by laying claim to the check as an obligation against the insured, continue the policy in force by virtue of the check being treated as payment. But in order to give this principle effect, the check must be accepted in lieu of actual payment, so as to give the insurer the absolute right to hold the drawer of the check liable thereon (*Chandler* v. *American Cen-*

*tral Life Ins. Co.*, 27 *Ga. App.* 810, 109 S. E. 919), the crucial test in any given case being whether or not the check was actually accepted as in payment of the premium. 40 A. L. R. 406, 423 (n. 4)." The general principle applies to the facts of the present case. Winton was given a worthless draft in payment for his mules. He relied on the representations of Butler that the draft would be paid on presentation. Its payment, under the general principle, was a condition precedent to the passing of the title to the mules into Butler. There is no evidence that Winton agreed to accept a worthless draft in payment. As soon as he found the draft would be dishonored, he took possession of his mules. Having thus acted, the draft ceased to be an obligation against Butler, irrespective of what might be its evidentiary value in an action of a different kind, between the parties. In Bank *v.* Kohl, supra, a buyer bought certain amounts of corn from farmers and gave therefor checks which proved to be worthless. The court said: "Did the two checks given by the grain company and dishonored by the bank constitute payment for the corn? The answer is no, you can not buy good corn with bad checks. . . The presumption that the checks were not received in payment is made conclusive here by the fact that the farmers were promised and understood they were to be paid for the corn on delivery. They did not agree to accept waste paper for cash. The buyer did not acquire title, no credit was extended, nor was it so intended. Title to the corn remained in seller." Butler never acquired title to the mules in this case by signing drafts which were dishonored.