The **BIRKETT L. WILLIAMS COMPANY** and Humphrey Central Chevrolet, Inc., Appellants,

v.

**James SMITH et al., Appellees.**

No. 22040.

United States Court of Appeals Fifth Circuit.

Nov. 30, 1965.

John M. Sikes and Lipshutz, Macey, Zusmann & Sikes, Atlanta, Ga., for appellants.

T. Baldwin Martin, T. Baldwin Martin, Jr., Martin, Snow, Grant & Napier, Macon, Ga., for appellees.

Before TUTTLE, Chief Judge, and BELL and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

This appeal includes two separate cases which were consolidated for trial and decision in the District Court. The Birkett L. Williams Company and Humphrey Central Chevrolet, Inc., both Ohio Corporations, brought the actions against four Georgia defendants: Macon Auto Auction, Inc., James Smith (owner of one-half the stock of that Auction), Oren Hill Motors, Inc., and Oren Hill individually. James Smith was an officer and director of The Macon Auto Auction, was its day to day manager, and represented the Auction in the transactions which were involved in these suits. Oren Hill performed a like function as to Oren Hill Motors, Inc.

These were trover actions for the alleged wrongful conversion of automobiles designated in the petitions and in the evidence. The total amount claimed in both actions is $36,500, with interest and costs. The issue in both cases is the same.

After depositions and affidavits were taken for interchangeable use in each case, plaintiffs, the Macon defendants, and Oren Hill all moved for summary judgments. Summary judgment was granted against Oren Hill and Oren Hill Motors, Inc., and these defendants have not appealed. Plaintiffs' motion for summary judgment against Macon Auto Auction, Inc., and James Smith was denied. The motion of these two defendants for summary judgment against the plaintiffs was granted. From this plaintiffs have appealed.

We affirm the Judgment of the District Court. And in this opinion we shall generally refer to corporate defendants as The Auction or as Hill Motors.

The factual findings of the District Court, which are not clearly erroneous if erroneous at all, were as follows:

Beginning sometime in 1959 or 1960 an arrangement was entered into by Macon Auto Auction, Inc. with Oren Hill on behalf of Oren Hill Motors, Inc., whereby the Auction Company agreed to advance funds to Hill Motors for the purchase of automobiles. This was referred to as a "floor planning" arrangement in which the advanced funds were considered as a loan to be repaid at the time such automobiles were sold by Hill Motors. The Auction Company charged Hill certain fees for this assistance, the details of which are immaterial to the decision of the case.

In early 1963, some of the dealers from whom Hill Motors had been purchasing automobiles became dissatisfied with the prior system in which automobile purchasers would draw drafts on auction companies in payment of the automobiles purchased. This resulted in an arrangement between the plaintiffs and Oren Hill, for Hill Motors, to issue checks or drafts drawn on Oren Hill Motors, Inc., rather than on Macon Auction. Macon Auction took no part in this arrangement. It continued in effect and was in effect at the time of the sale of the automobiles here involved.

When Hill Motors purchased automobiles from the plaintiffs, physical possession thereof was delivered to Hill and the vehicles were transported to Toccoa, Georgia, where they were re-conditioned and then carried to Macon and sold through the Auction or, in some instances, sold privately by Oren Hill. He was free to sell as he liked, either through the Auction or otherwise.

When automobiles were sold through the Auction, Macon Auto Auction would collect the sale price from the purchaser and would issue its check to Hill Motors, less a twenty dollar auction fee. The record does not show how Macon Auto Auction collected a fifteen dollar "floor planning" charge made for money which had been advanced to Hill Motors for the purchase of the automobiles.

On sales made through the Auction, bills of sale were executed by Hill Motors directly to the purchaser.

Returning to the automobiles purchased by Hill in Ohio, and as already

stated, plaintiffs would immediately deliver physical possession thereof to him. After early 1963, in payment therefor Oren Hill would deliver to these plaintiffs a check or draft drawn on the bank account of Oren Hill Motors, Inc. Sometimes these checks or drafts would be delivered to plaintiffs on the day the automobiles were purchased. On other occasions the drafts would be delivered several days later, before Mr. Hill returned to Georgia. On one or two occasions Mr. Hill returned to Georgia and the checks or drafts were delivered when he returned to Cleveland the next week.

The checks or drafts given by Hill were not immediately deposited for collection. On the contrary, they would be held until such time as plaintiffs had secured Ohio title certificates to the purchased vehicle. The title certificates would then be attached to the check or draft, the same would be entered for collection, with the certificates to be delivered to Hill Motors when the drafts or checks were honored and paid. A great part of the time the automobiles thus handled would have already reached Georgia and been sold through Macon Auto Auction, or privately, *before plaintiffs deposited or entered the checks or drafts for collection.*

Ohio has a title registration law, but the plaintiffs knew that the automobiles here involved would be transported to the State of Georgia for resale. Georgia was not a title state. Plaintiffs never obtained from Hill Motors for recordation in Georgia any retention of title contract or bill of sale to acknowledge debt. Macon Auto Auction and/or James Smith never at any time had any connection with either of the plaintiffs. They knew that some of the automobiles had been purchased in the State of Ohio, they had no knowledge of the Ohio transactions here described, but they knew, as a matter of course, that Oren Hill and/or Oren Hill Motors, Inc. had possession of the automobiles when he presented them for sale through the Macon Auction. This system, other than the change in mechanics for payment in Ohio, continued uninterruptedly and without any trouble, for at least four years.

In the Humphrey suit seventeen automobiles were involved. Ten were covered by the "floor planning" arrangement heretofore mentioned, and seven had been purchased by Oren Hill with funds he had or which he obtained from other sources. Thirteen of the automobiles were sold through the Auction and four were sold at private sale. Neither Macon Auto Auction nor James Smith purchased any of these automobiles.

In the Birkett L. Williams case, eight of the ten automobiles involved were financed through the "floor planning" arrangement and the other two from other sources. Six of the automobiles were sold through the auction and four at private sale.

The fire broke out in July, 1963. Nine drafts in the total amount of $11,450 issued by Oren Hill Motors, Inc. to Birkett L. Williams Company were returned by the Bank of Toccoa for "insufficient funds". Ten checks or drafts given Humphrey Central Chevrolet, Inc. were likewise returned. On September 16, 1963, plaintiffs demanded possession of the automobiles involved in these actions. Defendants failed to deliver. The actions in trover promptly followed.

Plaintiffs originally charged a legal joint venture between and among the parties defendant. According to the findings of the District Court, this position was subsequently abandoned and plaintiffs ultimately sought to prevail on the theory that Macon Auto Auction and J. W. Smith, as agents for Oren Hill Motors, exercised such dominion over the automobiles as to constitute conversion and to permit recovery in trover.

In response to this, the District Court further found as follows:

"It is undisputed in the record that at the time plaintiffs sold and delivered the motor vehicles here involved to Oren Hill Motors, Inc., that they well knew that Oren Hill Motors, Inc. was a dealer in automobiles and they dealt with Oren

Hill and Oren Hill Motors, Inc. as such dealers, knowing that they intended to transport the motor vehicles delivered to them to Georgia and there resell them.

"It is undisputed in the record here that neither of the plaintiffs obtained any written contract, conditional sales contract, retention of title contract, or any other writing showing title to be reserved in plaintiffs and that no writing was attested and recorded as required by Georgia law.

"It is also undisputed in the record that the motor vehicles here involved were delivered to Oren Hill— Oren Hill Motors, Inc., who caused the same to be transported to Georgia and that Macon Auto Auction, Inc. and/or O'Neal-Smith advanced money to said Oren Hill on certain of the motor vehicles so transported to Georgia.

"It is undisputed in the record that at the time Macon Auto Auction, Inc. or James Smith, individually, or as a partner of O'Neal-Smith advanced money on the automobiles that they were innocent and had neither notice or knowledge of any claim of either plaintiff or of the facts upon which plaintiffs' claims are based, and had no knowledge of where or from whom Oren Hill or Oren Hill Motors, Inc. had obtained such motor vehicles.

"It is also clear in the record that each of the vehicles which Macon Auto Auction, Inc. or O'Neal-Smith advanced money that were delivered to Macon Auto Auction, Inc. or O'Neal-Smith, were delivered into the actual physical possession of Macon Auto Auction, Inc. or O'Neal-Smith before they had any notice or knowledge that the checks or drafts given in payment for said motor vehicles had been deposited or payment refused thereon."

The District Court then proceeded to state its conclusions of law, and wound up by granting summary judgments as recited at the outset of this opinion.

■ The law of the place where the property is situated at the time of conversion governs an action in trover. Cook Motor Co. of Panama City, Inc. v. Richardson, 1961, 103 Ga.App. 129, 118 S.E.2d 502; 89 C.J.S. Trover and Conversion § 70.

■ The real problem here, therefore, is the determination under Georgia law of the liability of *an auctioneer* for conversion when he auctions property in behalf of a principal who has no title thereto but who, according to all the evidence, has been set free over a period of years by the actual owners to make just such sales as are now complained of. Counsel on both sides have been most diligent, but they have not been able to cite any Georgia precedent dealing with the liability of an auctioneer under the situation now before us. We have been unable to find any in our own research. Many cases illustrative of the general principles of trover and conversion in Georgia have, of course, been brought to our attention, but everyone of them fails in some material particular, either on factual or legal issues, to determine the problem here. In the absence of the all encompassing case in point, sitting as a Federal appellate court, we are forced in this diversity action as best we can to determine if the District Court applied the law as would the Georgia Courts of Last Resort.

United States v. Union Livestock Sales Co., Inc., (4 Cir. 1962), 298 F.2d 755, 96 A.L.R.2d 199, was a case in which an auctioneer in West Virginia sold cattle brought to the sale from Ohio, on which the United States held a lien. In that case it was held to be the almost universally accepted rule that an auctioneer who receives property from his principal and sells it and pays the proceeds of the sale to the principal is guilty of conversion if the principal has no title to the property, even though the auctioneer acts without knowledge of the defect in title. This one sale, however,

was the only transaction between the parties and there was no question of waiver or consent.

The annotation in 96 A.L.R.2d, at page 211, points out that " * * * the circumstances or the conduct of the owner or lienor may be such as to show consent to the sale * * * thus precluding a recovery from the auctioneer".

■ " * * * if the owner expressly or impliedly assents to or ratifies the taking, use, or disposition of his property, he cannot recover as for a conversion thereof; and this is true although defendant exceeded the power given him." 89 C.J.S. Trover and Conversion § 5.

■ "If, however, the person from whom defendant obtained the property had possession of it under circumstances known or assented to by the owner, which justified an inference of apparent authority to make the disposition complained of, trover will not lie." 89 C.J.S. Trover and Conversion § 45.

"It is a general rule that one cannot maintain an action for a wrong occasioned by an act to which he has consented. Thus, an act which would otherwise constitute a conversion may be precluded from having that effect by the plaintiff's consent to the act". 53 Am. Jur., Trover and Conversion, Section 82.

Appellant has cited the following Georgia cases which held that an agent can be guilty of a conversion even though he has no knowledge of the true owner's title and acts in good faith: National Bank of Tifton v. Piland, 1918, 22 Ga. App. 471, 96 S.E. 341; Friedman v. Odom, 79 Ga.App. 107, 53 S.E.2d 136; Graham v. Frazier, 1950, 82 Ga.App. 185, 60 S.E.2d 833.

■ This no doubt is the general Georgia rule. We have examined each of these cases, however, and in each of them lack of consent is specifically stated or mentioned as necessary to the action. We conclude from these references in each of these cases to this exception that if the owner consents to a sale he waives his right in trover.

We are aware of the decision of the Georgia Court of Appeals in Comer v. Rome Chevrolet Co., 1930, 40 Ga.App. 820, 151 S.E. 678, in which it was held as follows:

"Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion. It is unnecessary to show that the defendant applied it to his own use, if he exercised dominion over it in defiance of the owner's right, or in a manner inconsistent with it. It is in law a conversion, whether it be for his own or any other's use."

But we also note that in that same opinion the Court said:

"Whoever takes and carries away the property of another *without his consent* (emphasis added) is not absolved from liability as for a conversion by his own good faith in the transaction, and although he may take the property by the consent of one whom he mistakenly believes to be the owner, he still may be held as for a conversion, where he refuses on demand to surrender the property to the true owner".

Here again, "without his consent" definitely appears.

We now quote *in extenso* from Capital Automobile Co. v. Ward, 1936, 54 Ga. App. 873, 189 S.E. 713.

"It is true that, where an agreement is made to sell personal property for cash, and on delivery of the property a check is given for the purchase price, as between vendor and vendee the title to the property does not pass unless it be expressly agreed between the parties that the check is taken as payment, and, where the check is presented to the bank by the vendor in the usual course of business and is returned as worthless, the vendor may recover possession of the property from the vendee. Winton v. Butler, 53 Ga.App. 696, 186 S.E. 773. However, this principle, by its express

terms, is applicable only as between vendor and vendee. 'The general rule, applicable to property other than negotiable securities, that the seller can convey no greater right or title than he has, is only predicable of a simple transfer from one person to another where no other element intervenes.' 24 R.C.L. 378, 379, § 665. Code, § 96–207, declares: "Where an owner has given to another such evidence of the right of selling his goods as, according to the custom of trade or the common understanding of the world, usually accompanies the authority of disposal, or has given the external indicia of the right of disposing of his property, a sale to an innocent purchaser divests the true owner's title." Now, it has been many times stated, and from practical necessity in the transaction of business should be adhered to, that possession of personal chattels, by virtue of which such person has been given dominion and control over the property as if it were his own, carried with it the presumption of ownership and consequent right of disposition of such chattel. Thus it would seem that where one, under a contract of sale, gives to another unrestricted and unqualified possession of personal property, to deal with and use as his own a bona fide purchase for a valuable consideration from such person in possession of the property, divests such owner of his title; although it may be said that the rights of such bona fide purchaser in such case do not depend upon the title or actual authority of the person with whom he deals directly, but are derived from the acts of the real owner, which preclude him from disputing, as against such bona fide purchaser, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the person making the transfer. 24 R.C.L. 379, § 688. This is merely a special application of the statute or rule embodied in our Code, § 37–113, that "When one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury shall bear the loss." We take it that no one would dispute the proposition that, if A and B should walk into a store and A should agree to purchase a certain article therein for cash, and gave a check therefor, and then immediately and in the presence of the seller and owner should turn and sell the article to B for a valuable consideration, under such circumstances the seller would be estopped to set up his title as against B, although the check might prove, upon due presentation to the bank, to be worthless. Then, could it be reasonably said that if, instead of standing by and watching the property sold by A to B, the seller allowed A to take the article away under a contract of sale and control and have dominion over it as if it were his own, and A later sold the property to B, a different rule would apply? We think not."

We have also examined Cook Motor Co. of Panama City, Inc. v. Richardson, 103 Ga.App. 129, 118 S.E.2d 502.

That case was an action in trover by a Florida automobile dealer to recover automobiles in the possession of a Georgia dealer who had purchased them from another Georgia dealer. The Florida dealer had sold the automobile to the first Georgia dealer in return for a sight draft, retaining the certificates of title required under Florida law. The sight draft was never paid and the certificates of title were never delivered by the Florida vendor to the Georgia vendee. The plaintiff took no step to protect his interest in such automobiles except the retention of the title certificates. It was held that trover would not lie to recover the property from the second vendee. The Court cited Georgia Code Section 96–207 "[w]here an owner

has given to another such evidence of the right of selling his goods as, according to the custom of trade or the common understanding of the world, usually accompanies the authority of disposal, or has given the external indicia of the right of disposing of his property, a sale to an innocent purchaser divests the true owner's title."

The Court said that this is merely a special application of the rule embodied in Code Section 37–113 that "[w]hen one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury shall bear the loss."

The Court emphasized that the plaintiff had done business with the first vendee in a similar manner many times before and that he took no security for his purchase price.

The Court then proceeded to say "[s]uch facts demand a finding that the plaintiff gave to such Georgia dealer such evidence of the right of selling his automobiles as according to the custom of the trade or the common understanding of the world usually accompanies the authority to dispose of them, that is, he gave to such automobile dealer possession of the automobiles under a contract for sale, which is 'external indicia of ownership' ".

The opinion further emphasized: (1) that the plaintiff knew at the time of the sale to the first Georgia dealer that the automobiles were to be brought into the State of Georgia; (2) the full faith and credit clause of the United States Constitution did not require under the circumstances of this case that the Georgia Courts give extraterritorial effect to the Florida automobile title registration law; and (3) the fact that the automobiles carried Florida license plates constituted no notice to the second vendee.

While the cited case deals with an effort to recover the automobiles from a second vendee, who was a purchaser instead of an auctioneer, it is hard to see how the rationale of the rule would be any different for an auctioneer who was not a general agent of the first vendor but merely auctioned the same to the second vendee, who received a bill of sale from the first vendee instead of from the auctioneer.

This is particularly true in light of the provisions of Section 96–114 of the Georgia Code, which reads as follows:

"Sales by auction.—In case of sales by auction, the auctioneer shall be considered agent of both parties, so far as to dispense with any further memorandum in writing than his own entries."

■ The trover action here is against the auctioneer, who was not a bona fide purchaser for value without notice but who was not a general agent of Hill Motors, Inc. or Oren Hill. He acted as agent for both the seller and the bona fide purchaser. He performed only one function, that is, he furnished the facilities by which the consideration of the sale from Hill to buyer was ultimately determined. If the circumstances described in Capital Automobile Co. v. Ward, supra, and Cook Motor Co. of Panama City, Inc. v. Richardson, supra, "demand a finding that the plaintiff gave to such Georgia dealer such evidence of the right of selling his automobiles as according to the custom of the trade or the common understanding of the world usually accompanies *the authority to dispose of them*", then we are unable to see how the auctioneer under the undisputed facts and circumstances of the present case could be required to stand in any different position than a bona fide purchaser for value without notice. Wrongful dominion is an indispensable element of trover.

■ The District Court found that at the time Plaintiffs sold and delivered the motor vehicles here involved they well knew that the vendee was a dealer in automobiles, that the automobiles were to be transported to Georgia, a non-title State, and there sold. This system had been in operation a long time. So far as the record shows it had never been in any manner questioned. Plain-

tiffs took no steps whatever to secure their interests under Georgia law. All these facts, in addition to the others herein recited, establish as a matter of law that the Plaintiffs consented to the sales which took place. There was no effort to question this consent until checks or drafts had been returned unpaid after the Auctioneer had already handled the vehicles. Therefore, the Auctioneer did not act wrongfully, which is another indispensable element of trover.

The action of trover for the alleged conversion of the automobiles in this case can neither avail nor prevail.

The Judgment of the District Court is affirmed.