690 F.2d 422
 34 UCC Rep.Serv. 1155
 RAWL'S AUTO AUCTION SALES, INC., Appellee,
v.
DICK HERRIMAN FORD, INC., Herndon Motor Co., Inc., and
Peacock Buick Company, Appellants.
RAWL'S AUTO AUCTION SALES, INC., Appellant,
v.
DICK HERRIMAN FORD, INC., Herndon Motor Co., Inc. and
Peacock Buick Company, Appellees.
 Nos. 81-1886, 81-1887.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 7, 1982.
Decided Oct. 8, 1982.
 
 Charles E. Carpenter, Jr., Columbia, S. C. (Donald V. Richardson, III, Richardson, Plowden, Grier & Howser, Columbia, S. C., on brief), for appellants.
 Jeter E. Rhodes, Jr., Columbia, S. C. (Herbert W. Hamilton, Whaley, McCutchen, Blanton & Rhodes, Columbia, S. C., on brief), for appellee.
 Before WIDENER, ERVIN and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal by plaintiff below is from a declaratory judgment action to determine ownership to the original certificates of title to 38 automobiles. Defendants below also cross appeal the denial of their counterclaims filed in response to the declaratory judgment action. The automobiles in question were purchased from the defendants (three Virginia retail automobile dealers), transported to South Carolina and sold to other automobile dealers at Rawl's Auto Auction Sales, Inc. (hereafter "Rawl's"). Despite the transfer of possession of the automobiles, the original certificates of title remain in the possession and control of the Virginia dealers. Rawl's brought a declaratory judgment action seeking an order directing the Virginia dealers to surrender possession of the certificates of title to Rawl's. The Virginia dealers counterclaimed, asserting a superior interest in the automobiles and seeking damages from Rawl's for conversion of the automobiles and damages for unfair trade practices. The district court denied the relief sought by all parties. We affirm.
 
 
 2
 * Rawl's is a wholesale automobile auction. Only registered automobile dealers may buy and sell at the auction. Rawl's does not permit dealers to participate in the auction until Rawl's personnel have undertaken an investigation of that dealer's reputation and credit standing. Rawl's does not require the dealers it approves to produce title certificates for the automobiles before they are auctioned. When the dealers bring the automobiles for auction, they are assigned a number and location on the auction lot. When the automobile's number is called, the selling dealer describes the automobile and bidding by the purchasing dealers commences. When the selling dealer agrees to a price, the auctioneer closes the deal. The purchasing dealer then inspects the vehicle. If the purchasing dealer is satisfied with the vehicle, he returns to Rawl's headquarters and pays Rawl's for the automobile. Rawl's, in return, issues its own guarantee of title to the purchasing dealer.
 
 
 3
 At the end of the day, Rawl's issues a check drawn on its own account to pay the selling dealers for the cars each dealer has sold that day. At all times relevant to the instant law suit, Rawl's had two basic methods of payment. If the dealer had a well established business relationship with the auction, Rawl's simply issued a regular check to the selling dealer for his automobiles. At the time of payment, the selling dealer usually surrendered any title certificates he possessed; in the case of those automobiles for which he did not possess title certificates, the selling dealer agreed to send Rawl's the titles as soon as they were received.
 
 
 4
 Although there is some conflict in the testimony on this point, Rawl's apparently issued regular checks to about 57 of the approximately 160 dealers who sold cars at the lot. This amounted to approximately one-half of the automobiles being auctioned at the lot.
 
 
 5
 The other method of payment was by title-attached check. The recipient of a title-attached check could not cash the check without first surrendering the title certificates to the automobiles for which the check was issued. These certificates were attached to the check when it was cashed and returned to Rawl's. Both the fact that Rawl's did not require dealers to produce title certificates before auctioning their cars and the fact that Rawl's issued its own title guarantee, permitted dealers to auction cars before actually possessing the title. Rawl's apparently issued title-attached checks to approximately two-thirds of the dealers who sold cars at the lot.
 
 
 6
 There was a time prior to 1979, when Rawl's attempted to obtain temporary so-called "S" titles from the South Carolina Highway Department for dealers who were unable to immediately produce the original title certificate to an automobile. Under this procedure, Rawl's would make a guarantee of title to the Highway Department. The Department would then issue Rawl's a temporary "S" title. Sometime later, when Rawl's received the original title, Rawl's would send the original title to the Highway Department and the Department would issue a regular title certificate to the automobile in question. The practice of issuing "S" titles ceased in 1979.
 
 
 7
 Prior to its bankruptcy in 1978 or 1979, H. L. Irvin, Inc. operated a small used car lot in Greenville, South Carolina. William Irvin, on behalf of H. L. Irvin, Inc., purchased automobiles wholesale from a number of sources including those in Virginia. Some of these used cars were resold through the Greenville used car lot. Many were resold to other dealers through Rawl's auction. H. L. Irvin, Inc. first began dealing with Rawl's around 1970 or 1971. At first, Rawl's always issued title-attached checks to H. L. Irvin, Inc. Beginning in 1974, however, Rawl's began issuing regular checks rather than title-attached checks to H. L. Irvin, Inc.
 
 
 8
 For many years William Irvin traveled to Virginia, acting on behalf of H. L. Irvin, Inc., and purchased used automobiles from each of the Virginia dealers, as well as other automobile dealers located in Virginia. In most instances, Irvin would travel to Virginia, look over the automobiles, and agree to buy certain of them while in Virginia. On some occasions, the purchase would be negotiated by telephone. In all these transactions, Irvin employed a fairly standard procedure of purchasing used automobiles.
 
 
 9
 Once Irvin and the individual dealer had agreed on the sale of specific vehicles, Irvin presented the individual dealer with an envelope draft (when negotiations were conducted by telephone, Irvin, of course, mailed the envelope draft to the dealer in question). On the face of the envelope, Irvin obligated H. L. Irvin, Inc. to pay the agreed price of the automobiles. In return for the envelope draft, the dealers gave Irvin possession of the automobiles, the keys to the automobiles, and a buyer's order for the automobiles. Irvin then transported the automobiles to South Carolina for resale. Upon receiving an envelope draft from Irvin, the dealers placed a bill of sale and the relevant automobile certificates of title in the envelope draft. The draft was then deposited in banking channels for collection. Several days after Irvin arrived back in South Carolina, the envelope draft would arrive at his bank. Irvin would authorize payment of the draft and he would be given possession of the bill of sale and the title certificates to the automobiles.
 
 
 10
 During the latter half of 1977, Irvin began to experience financial difficulties. The Virginia dealers began to notice that Irvin's payments were slow and that they had to authorize Irvin's bank to hold the envelope drafts for a longer period than the three days normally allowed for payment. Rawl's also began to notice that Irvin was slow in returning the titles to automobiles that had been auctioned. Upon inquiry Irvin usually responded that he had not been by the bank or that he was experiencing a little difficulty and needed some extra time. Both the Virginia dealers and Rawl's continued to deal with Irvin during late 1977 and early 1978. This is true even though some titles remained at the bank for as long as one month.
 
 
 11
 All of the vehicles that are the subject of this action were sold at various times by the three Virginia dealers to H. L. Irvin, Inc. in late 1977 or early 1978. The usual envelope drafts were used in payment for each of the vehicles. All of the automobiles were transported to South Carolina and sold by Irvin to other dealers through Rawl's auction. The other dealers have since sold the automobiles to individual owners. Rawl's issued regular checks to Irvin in payment for the automobiles. Irvin, however, never paid the Virginia dealers for the automobiles. Since the envelope drafts were not paid, the drafts and the titles contained therein were returned to the respective Virginia dealers and have been in their possession ever since.[1]
 
 
 12
 In the district court Rawl's claimed superior title to the original title certificates on grounds: "(1) that the Virginia dealers completed a sale of the vehicles to Irvin, who completed a sale to Rawl's; (2) that the Virginia dealers by their conduct are prevented on equitable grounds from asserting claims of ownership under the doctrines of waiver, estoppel, and consent; (3) that under both the South Carolina Bailment Statute and a similar provision of the Virginia Code, the alleged security interest of the Virginia dealers was not perfected and does not constitute a lien on the vehicles; (4) and under the Entrustment Provisions of the Uniform Commercial Code, the Virginia dealers gave possession of the cars to a dealer in goods of that kind, thereby empowering him to transfer title." The Virginia dealers asserted that under Virginia law, title to the automobiles never passed to Irvin and thus could not have been transferred by him to Rawl's. The Virginia dealers also asserted that Rawl's was not a "buyer in ordinary course of business" from Irvin and thus could not have benefited from the entrustment provisions of the Uniform Commercial Code.
 
 
 13
 The district court, sitting without a jury, found that Rawl's was not a "buyer in ordinary course of business" from Irvin since Rawl's had deviated from its normally prudent course of issuing title-attached checks for automobiles auctioned without the title certificates. The district court ruled that "Rawl's deviation from his normally prudent course of conduct removes him from the category of an innocent purchaser for value, a common-law parallel requirement for a buyer in the ordinary course of business." The district court agreed with the Virginia dealers that under Virginia law, title never passed to Irvin and thus could not have passed to Rawl's. The district court also denied the Virginia dealers counterclaims.
 
 II
 
 14
 On appeal Rawl's again asserts a superior ownership interest in the automobiles on grounds that the Virginia dealers completed sales of the automobiles to H. L. Irvin, Inc., who in turn completed sales of the automobiles to Rawl's. The crucial issue with respect to this argument is whether the withholding of the certificates of title by the Virginia dealers precluded transfer of ownership to H. L. Irvin, Inc., and thus to Rawl's.
 
 
 15
 Relying on South Carolina law, Rawl's contends that a completed sale of the automobiles occurred between the Virginia dealers and Irvin at the time the parties agreed on a price, Irvin made payment in the form of envelope drafts, and the Virginia dealers gave Irvin possession of the automobiles. The Virginia dealers contend that Virginia law governs the transaction between them and Irvin, that Virginia is a strict title state, and that since the title certificates were never transferred to Irvin, ownership in the automobiles never vested in Irvin.
 
 
 16
 As the forum state, South Carolina's choice of law rules govern choice of law questions. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). South Carolina would most likely apply the traditional choice of law rule.[2] The traditional rule for transfer of ownership in chattels states that the type of interest conferred by a transaction is governed by the law of the state where the chattel is located at the time of the transaction. Williston on Sales § 9c (1947); Restatement (First) Conflicts § 248; and Dobbins v. Martin Buick Company, 216 Ark. 861, 227 S.W.2d 620, 622 (1950). Since the automobiles were located in Virginia at the time of the transaction between the Virginia dealers and Irvin, Virginia law governs the type of interest conferred by the transactions between the Virginia dealers and H. L. Irvin, Inc.[3]
 
 
 17
 In Thomas v. Mullins, 153 Va. 383, 149 S.E. 494 (1929), the Supreme Court of Appeals of Virginia ruled that an automobile dealership must have complied with the Virginia title registration statute[4] to complete a transfer of ownership in an automobile. 149 S.E. at 495-96. After the decision in Thomas v. Mullins, Virginia has been viewed as a strict title state with respect to the passage of ownership interests in automobiles. Nationwide Insurance Company v. Storm, 200 Va. 526, 106 S.E.2d 588 (1959); United States Fidelity and Guaranty Company v. Trussell, 208 F.Supp. 154 (W.D.Va.1962); Travelers Indemnity Company v. Nationwide Mutual Insurance Company, 227 F.Supp. 958 (W.D.Va.1964); Wilson v. Commercial Finance Co., 239 N.C. 349, 79 S.E.2d 908 (1954); and Michie's Jurisprudence, § 129 at 319. As noted in Travelers Indemnity Company v. Nationwide Mutual Insurance Company, supra at 962-64, much of the authority initially relied upon by the Virginia Supreme Court in deciding Thomas v. Mullins and Nationwide Insurance Company v. Strom has now been reversed or eroded. We agree with the court in Travelers, however, that until such time as the Virginia Supreme Court indicates a contrary intention, the best interpretation of the case law is that Virginia continues to be a strict title state. Accordingly, we find that the withholding of the title certificates by the Virginia dealers prevented H. L. Irvin, Inc. from acquiring ownership of the automobiles. Rawl's claims to ownership based strictly on "completed sales" between the Virginia dealers and H. L. Irvin, Inc., therefore, must fail since H. L. Irvin, Inc. never owned the vehicles.
 
 
 18
 At the time of the sales to Rawl's, the automobiles in question were in the possession and control of H. L. Irvin, Inc. Rawl's argues that since it purchased the automobiles from the inventory of used automobiles maintained for resale by H. L. Irvin, Inc., Rawl's is entitled to protection both under the entrustment provisions of the Uniform Commercial Code and under the principles of estoppel, waiver and implied consent.
 
 
 19
 These contentions raise the issue of whether Virginia law or South Carolina law applies to determine the ownership interest conferred by the transactions between H. L. Irvin, Inc. and Rawl's. Since the automobiles were located in South Carolina at the time of the transactions, traditional conflicts of laws principles dictate that South Carolina law be applied.[5] Restatement (First) Conflicts § 253; Holt Motors v. Casto, 136 W.Va. 284, 67 S.E.2d 432 (1953).
 
 
 20
 As enacted in South Carolina, the pertinent portions of the entrustment provisions of the Uniform Commercial Code provide:
 
 
 21
 Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entrustor to a buyer in ordinary course of business.
 
 
 22
 "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.
 
 
 23
 In American Lease Plans, Inc. v. R. C. Jacobs Plumbing, Heating & Air Conditioning, Inc., 274 S.C. 28, 260 S.E.2d 712 (1979), the South Carolina Supreme Court applied the entrustment provisions to resolve an ownership dispute between the owner of a truck, who leased the truck to an automobile dealership, and a plumbing and heating company that purchased the truck from the dealership. The trial court had ruled that the company that purchased the truck from the dealership was not a "buyer in ordinary course of business" since the company had "experience and extensive dealings in buying and selling vehicles." The supreme court applied the entrustment provisions to the sale by the dealership, but found that the plumbing and heating company's experience and extensive dealings in buying and selling automobiles were not enough to disqualify it from status as a buyer in ordinary course.
 
 
 24
 In the instant case, the critical question is whether Rawl's, a wholesale used car auction, qualifies as a buyer in ordinary course. As defined in S.C.Code § 36-1-201(9) (1976), buyer in ordinary course means "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights ... of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ...." The district court ruled that Rawls did not qualify as a buyer in ordinary course since it deviated from its normally prudent course of issuing title-attached checks. The district court also found that "Rawl's knew, or should have known, after the first five or six sales that Irvin did not have the titles to these cars and that he could not get them until he paid the envelope drafts that he had used in payment thereof...."
 
 
 25
 The Virginia dealers do not argue that the auto auction's extensive dealings in the used car market disqualify it from status as a buyer in ordinary course. Instead, basically accepting the reasoning of the district court, they assert that Rawl's was not a buyer in ordinary course since with respect to these vehicles it deviated from its usual practice of issuing title-attached checks and since it attempted to obtain so-called "S" titles for the automobiles in question.
 
 
 26
 The testimony credited by the district court shows that by the time the subject automobiles were put up for auction, Rawl's knew that Irvin was having financial problems. Rawl's also knew that Irvin was slow in delivering the titles for many of the automobiles he was selling through the auction at that time. In addition, Rawl's knew the reason for Irvin's delay in producing the titles was the bank's refusal to release titles until Irvin paid for the automobiles. Based on these facts, Rawl's should have known that if it did not issue Irvin title-attached checks, Irvin could default to the bank with the resulting inability to deliver the original titles to Rawl's. Since Rawl's took this risk with actual knowledge of the circumstances, the district court was not clearly erroneous in finding that such actual knowledge now prevents Rawl's from now asserting buyer in ordinary course status as a part of a declaratory judgment action to recover the titles.
 
 
 27
 Rawl's correctly cites Clanton's Auto Auction Sales, Inc. v. Harvin, 238 S.C. 352, 120 S.E.2d 237 (1961); Ex Parte Dort, 238 S.C. 506, 121 S.E.2d 1 (1961); and Clanton's Auto Auction Sales, Inc. v. Young, 239 S.C. 250, 122 S.E.2d 640 (1961), for the proposition that South Carolina common law affords the "innocent" purchaser from a person who regularly deals in goods of that kind protection from hidden interests of third parties.[6] In Ex Parte Dorte, supra, and Clanton's Auto Auction Sales, Inc. v. Harvin, supra, the supreme court indicates that a purchaser from an automobile dealer is not an "innocent" purchaser if he has notice of a third party's ownership interest in the automobile. 121 S.E.2d at 3; and 120 S.E.2d at 239. While the statements in these two cases are dicta, the South Carolina Supreme Court has elsewhere indicated that an "innocent" purchaser of an automobile is not "innocent" if he or she has notice of defects in the seller's title. Russell Willis, Inc. v. Page, 213 S.C. 156, 48 S.E.2d 627, 632-33 (1948). Cf., Atlas Finance Co. v. Credit Co., 216 S.C. 151, 57 S.E.2d 65, 68 (1949). We therefore agree with the district court that the same actual knowledge and failure to follow its ordinary course of dealing that prevents Rawl's from prevailing under the entrustment provisions also prevents it from prevailing on its estoppel, waiver and implied warranty theories.
 
 
 28
 Rawl's also asserts that the South Carolina Bailment Statute, S.C.Code § 27-23-80 (1976), voids any interest the Virginia dealers may have had in the automobiles. The bailment statute provides that a bailor's interest in goods is void as to subsequent purchasers without notice, unless the bailment is reduced to writing and recorded. Since Rawl's had notice that third parties were attempting to retain interests in the automobiles Irvin auctioned, it is not entitled to the protection afforded by this statute.
 
 III
 
 29
 The Virginia dealers assert that the district court erroneously denied their counterclaims for conversion and unfair trade practices. We are aware of no instance in which the South Carolina Supreme Court has addressed the issue of an auctioneer's liability for conversion. General case law on the subject is discussed in an annotation at 96 A.L.R.2d 208 (1964). The general rule, as noted in this circuit's opinion in United States v. Union Livestock Sales Company, 298 F.2d 755, 760 (4th Cir. 1962), is that an auctioneer "who receives property from his principal and sells it and pays the proceeds of the sale to him is guilty of conversion if the principal has no title to the property, even though the agent acts without knowledge of the defect in the title." The rule is opposite however, where, as here, the owner acquiesces or consents to the principal's possession of the property. Anno., supra, § 13; Birkett L. Williams Company v. Smith, 353 F.2d 60 (5th Cir. 1965). Accordingly, since the Virginia dealers consented to Irvin's possession of the automobiles, we find they were not entitled to judgment on the conversion counterclaim.
 
 
 30
 The Virginia dealers also assert that the district court erred in denying their counterclaim under the South Carolina Unfair Trade Practices Act, S.C.Code §§ 39-5-10 et seq. The Virginia dealers argue that strict adherence to the South Carolina Certificate of Title Laws is required and that Rawl's practice of securing "S" titles was an unfair trade practice. Until the decision in In the Matter of: 1972 Capri, supra, the South Carolina Highway Department at least implicitly approved the use of "S" titles. In light of this fact, we hold that the district court's finding that Rawl's had not violated Unfair Trade Practices Act was not error.
 
 
 31
 For the foregoing reasons we agree with the district court that Rawl's did not have a superior ownership interest in the title certificates now in the possession of the Virginia dealers and that the district court was correct in finding for Rawl's on the Virginia dealers' counterclaims. Accordingly, the result below is affirmed.
 
 
 
 [1]
 Despite the fact that the Virginia dealers withheld the titles to the automobiles that are the subject of this suit, Rawl's succeeded in getting "S" titles issued for these automobiles. The Virginia dealers commenced a State administrative action to compel the South Carolina Highway Department to revoke the "S" titles. This action was eventually appealed to South Carolina Supreme Court, which ruled that the "S" titles for the vehicles subject to this action had been erroneously issued in violation of State title statutes. The Court upheld an order revoking the "S" titles. In the Matter of: 1972 Capri ID GAECMRH7509, 274 S.C. 88, 261 S.E.2d 307 (1979)
 
 
 [2]
 See, Algie v. Algie, 261 S.C. 103, 198 S.E.2d 529 (1973) and Gattis v. Chavez, 413 F.Supp. 33 (D.S.C.1976) (applying traditional rule to tort action); and Associated Spring Corp. v. Wilson, Inc., 410 F.Supp. 967 (D.S.C.1976) (citing early South Carolina case for traditional rule in a contract action)
 
 
 [3]
 Since Virginia is also the state with the most significant relationship to the automobiles at the time of the transfer to Irvin, Shanahan v. George B. Landers Construction Company, 266 F.2d 400 (1st Cir. 1959), Virginia law would also provide the rule of decision under contemporary choice of law principles
 
 
 [4]
 The Virginia Motor Vehicle Registration Statute is codified at Virginia Code § 46.1-68 et seq. (1950)
 
 
 [5]
 Contemporary choice of law principles also dictate application of South Carolina law. See, Shanahan v. George B. Landers Construction Company, supra
 
 
 [6]
 Reliance on this pre-Uniform Commercial Code law raises the issue of whether the entrustment provisions of the Code supersede earlier common law, equitable principles and statutes on the subject of one who purchases from a person who deals in goods of that kind. The official comments to the Code state that " 'supplementary general principles' of law to sales transactions ... continue unimpaired all rights acquired under the law of agency or of apparent agency or ownership or other estoppel ...." (emphasis added). We decline to address the issue of whether prior law continues to supplement the entrustment provisions since we find that Rawl's is not entitled to prevail under any of the prior rules of decision