ASSOCIATED SPRING
CORPORATION,
Plaintiff,

v.

ROY F. WILSON & AVNET,
INC., Defendants.

Civ. A. No. 74–958.

United States District Court,
D. South Carolina,
Greenville Division.

Feb. 16, 1976.

Douglas McKay, Jr., McKay, Sherrill, Walker, Townsend & Wilkins, Columbia, S. C., and N. Heyward Clarkson, III, Greenville, S. C., for plaintiff.

William W. Kehl, Wyche, Burgess, Freeman & Parham, Greenville, S. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HEMPHILL, District Judge.

Plaintiff in this action is a Delaware Corporation with its principal place of business located in Bristol, Connecticut; its Bowman Products Division (Bowman), headquartered in Cleveland, Ohio, is principally engaged in the business of selling at wholesale various automobile and truck parts and related products. Defendant Wilson, a South Carolina citizen and resident, was formerly one of a number of independent sales representatives employed by Bowman but now works in a similar capacity for one of Bowman's competitors, the Fairmount Motor Products Divisions of defendant Avnet, Inc., a New York corporation.

Bowman seeks in this action to enforce a covenant contained in its contract with Wilson which would prohibit him from soliciting sales from certain customers to whom he had sold during his employment by Bowman. Plaintiff requests that Wilson be enjoined from further violation of the covenant, that Avnet, Inc. be enjoined from participating in and benefiting from Wilson's violation of the covenant, and that actual and punitive damages be awarded against Wilson and Avnet for past violations. Defendants admit violation of the covenant but contend that the provision is unenforceable because of Bowman's own breach of the contract terms. Avnet further denies any actions on its part to induce the breach of or otherwise interfere with Wilson's contract with Bowman.

The case was heard before the court without a jury in Greenville, South Carolina on October 2 and 3, 1975, being consolidated for the purpose of trial with Civil Action No. 74–1191, *Associated Spring Corp. v. John Leroy Julian, Jr., and Avnet, Inc.*, and upon the credible testimony and exhibits there presented, the court now publishes the following

## FINDINGS OF FACT

1. On July 29, 1971 Roy F. Wilson signed a "Salesman's Agreement" with Bowman which was executed by an agent of Bowman and became effective on August 19, 1971. This contract generally authorized Wilson "to solicit orders for certain merchandise offered by the Company for sale," and it contained, among others, the following provisions which appear relevant to the issues in this action:

*1. TERRITORY*

The Company hereby appoints the Salesman the Company's sales representative in its Territory No. 1056–22. Said territory consists of certain specified or generally described accounts, which are hereby assigned to the Salesman, located in a defined geographical area. Said accounts are set forth or described in a certain document on file in the Company's office, called "Territory Description", bearing

the Salesman's name and territory number. Said Territory Description contains also a list of or description of accounts, if any, which, although within the aforesaid geographical area, are excluded from the Salesman's territory. The accounts which are included in the Salesman's territory are hereinafter referred to as "territory". If said Territory Description shall include any general classification(s) of accounts declared to be "Open to all salesmen", the accounts within such classification(s) shall not be included in the Salesman's territory unless and until so included by supplemental agreement. The aforesaid Territory Description is now in existence and is incorporated herein by reference and is hereby made a part of this agreement to the same extent as if fully rewritten herein. A copy of said Territory Description has been delivered to the Salesman who hereby acknowledges its receipt.

## 2. DUTIES

. . . The Salesman agrees to devote his best efforts to the performance of his duties for the Company, to give proper time and attention to furthering the Company's business, to confine his activities to the territory assigned to him and to refrain from soliciting in or accepting orders from other territories, and to comply with all rules, regulations and instructions contained in the Sales Manual and the Official Bulletins issued by the Company. . . .

## 3. COMPENSATION

. . . The Salesman acknowledges that he has received a copy of the Company's Sales Manual and that he has read and understands the contents of said Sales Manual, and particularly Sections 5 and 9 pertaining to Reserve Accounts and Compensation. Both parties agree that the said Sales Manual is incorporated herein and is hereby made a part of this Agreement to the same extent as if fully rewritten herein, and that the terms and provisions of said Sections 5 and 9 are hereby agreed to.

## 5. CONFIDENTIAL INFORMATION

The Company will furnish certain secret customer lists and other confidential customer information of the Company, including but not limited to information regarding each customer's type of purchases, volume of business, details of previous calls and personal data regarding each individual buyer, etc. The said secret customer lists and confidential customer information shall remain the property of the Company and the Salesman agrees that he will accept and keep such information in confidence during the term hereof and thereafter, and upon termination of this agreement, for any cause, at once return all written confidential customer information to the Company, and he will thereafter, refrain from using or disclosing to third parties the contents of such secret customer lists or confidential customer information.

## 8. RESTRICTIVE COVENANT

The Salesman agrees that upon termination of this agreement for any reason whatsoever he will not, for a period of two (2) years thereafter, sell or attempt to sell any products of the same or similar kind as those sold by the Company, to any of the customers to whom he made one or more sales for the Company within the last two years prior to such termination. The Salesman agrees that his promise herein made so to refrain from selling or attempting to sell means that he will not, directly or indirectly, either as an individual on his own account or as a partner, employee, agent or salesman of or for any person, firm, association or corporation, or as an officer, director or stockholder of any closely-held corporation as hereinafter defined, engage in selling or attempting to sell any of said products to any of the customers hereinabove designated. This covenant shall not be deemed violated by the Salesman's engaging in

the business of a manufacturer or retailer of said products, but it shall be deemed violated by any sale of said products to any of said customers by the Salesman in or for a business combining retail and wholesale sales if the wholesaling is a substantial part of such combined business. For the purposes of this covenant automobile manufacturers and their franchised new-car dealers shall not be considered to be in the business of wholesaling.

The term "closely-held corporation", as used herein, shall be any corporation in which the Salesman or his wife, child or parent owns, directly or indirectly, more than ten per cent (10%) in value of the outstanding stock, or a corporation in whose management the Salesman is an active participant.

If it should become desirable or necessary for the Company to seek compliance with this covenant by judicial proceedings, the period during which the Salesman will not sell or attempt to sell any products of the same or similar kind as those sold by the Company to any of the customers to whom he made one or more sales for the Company, shall extend to the second anniversary of the date of the judicial order requiring such compliance.

This covenant on the part of the Salesman is of the essence of this agreement; it shall be construed as independent of any other provision in this agreement, and the existence of any claim or cause of action of the Salesman against the Company, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant.

## 9. TERM

. . . During the term hereof the Salesman shall act as the Company's exclusive sales representative for the accounts assigned to the territory in the aforesaid Territory Description, provided he is diligently soliciting orders and serving accounts in the territory. . . .

10. This agreement shall be construed in accordance with the laws of the State of Ohio. There are no verbal agreements between the parties. All terms and conditions are set forth in this agreement, and in the aforesaid Territory Description and the Sales Manual, both of which are incorporated herein. This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

Pursuant to the provisions contained in the section above denoted "TERRITORY," the following "Territory Description" was incorporated into Wilson's contract with Bowman:

TERRITORY DESCRIPTION   EFFECTIVE DATE   8–16–71   TERR. NO. 1056–22

Effective date applies to geographical area and classifications indicated below.

Name   R. F. Wilson          Sales No. 2227     On List Date   8–16–71

## CLASSIFICATIONS ASSIGNED

X  NEW CAR DEALERS    X  OTHER AUTOMOTIVE X  NON–AUTOMOTIVE

| | | |
|---|---|---|
| Ford | Body Shop | Contractors |
| Chrysler | General Garage | Marine |
| Chevrolet | Service Station | Farm Equipment |
| Other G.M. | Fleets | Miscellaneous |
| All Other Dealers | | |

## CODE TO IDENTIFY ASSIGNMENT

X — Assigned to this territory  T — Assigned to another territory

Other territories involved with this territory:  1050–22, 1051–22, 1053–22, 1059–22, 1064–22, 1070–22

General Location: Western N. C. & Western S. C.

Registration: _____

## COUNTIES ASSIGNED

**N. C.**

Anson
Catawba
Cleveland
Gaston
Lincoln
Mecklenburg
Union

**S. C.**

Cherokee
Chester
Union
York

---

The above "Territory Description" was forwarded to Wilson prior to the effective date of the contract along with an attachment which included the following:

*TERRITORY DESCRIPTION*

We are attaching to this letter a description of your territory. Please check this description at once, advising us immediately if it is not perfectly clear.

Your territory, as it is defined on the attached sheet, will continue in force until otherwise agreed.

One inflexible rule regarding territories assigned by this company is that each salesman has complete right to the accounts specified on his territory description sheets. If Salesman A obtains an order from an account assigned to Salesman B, Salesman A will receive no commission, and Salesman B will receive full commission. If any salesman continues to call on accounts not assigned to him, it will be considered just cause for termination of his employment.

Pursuant to the section above denoted "COMPENSATION," the contract incorporated the provisions of the Sales Manual, which included the following

"RULES REGULATING TERRITORIES":

Before you start working in your territory we will send you a description of the territory assigned to you. Do not solicit business from any classification of accounts that are not shown on your territory description, Form A–147, or T.D. as it is more frequently referred to.

All territories are protected for the salesmen to whom they are assigned. Any normal business coming from a territory will be credited to the man to whom the territory has been assigned. Please note that orders are credited according to point of origin. If one central buying agency makes purchases for a group of dealers or branch warehouses, the order is credited to the salesman covering the territory in which the central buying agency is located.

The office will not recognize any deviation from the territories as specified in the territory description. Should you in conjuction (sic) with another salesman, or by any other means, arrange for temporary deviations from these specifications it will be necessary for you to notify and receive the ap-

proval of your district manager in writing before proceeding with such temporary arrangements. Your District Manager will notify the Cleveland Office of such approvals.

If a salesman calls on an account that is not in his territory, unless specifically instructed by the office or his district manager to call on this account, any commissions resulting from business thus obtained will automatically be paid to the salesman to whom the territory has been assigned.

Continued offenses of this nature by any salesman will be considered cause for dismissal.

.    .    .    .    .

2. According to the testimony of the defendant Wilson, his sales calls during the period immediately after his employment were made, according to instructions given him by the company, or anyone in his territory, including "industrial" customers, who would buy Bowman products. Bowman's District Sales Manager James Puryear did in fact encourage Wilson to call on certain "fleet" customers which were classified as "industrial division" accounts; Puryear assisted Wilson in this solicitation although, as Puryear testified, Bowman regarded Wilson as "commercial division" salesman. (Neither Wilson's salesman's agreement nor his territory description contains any mention of his status as a commercial salesman or of the existence of the commercial and industrial divisions, and they do authorize Wilson to call on "fleets.")

On October 11, 1971 Bowman issued a bulletin to all salesmen (plaintiff's Exhibit 5) supplementing its Sales Manual and containing the following information reclassifying certain fleet accounts:

Please find attached a copy of both the Industrial and Commercial territory descriptions. It is important that you solicit business only in the class of accounts assigned to your division.

Please bear in mind that when an industrial plant is servicing a fleet of vehicles and that service is being done within the confines of the industrial complex, this fleet is industrial.

After this bulletin, which restricted the number of accounts he was authorized to service, was issued, Wilson continued to service some fleet accounts now classified as industrial with the assistance of Puryear, who ever accompanied Wilson to such an account in Gastonia in late 1972 and presented a slide presentation as a sales aid. Puryear testified that, notwithstanding the above bulletin, the industrial/commercial distinction was "not inflexible" and some commercial salesmen did sell to industrial accounts. Wilson testified that he was not aware that Bowman had any industrial salesman soliciting sales anywhere in his territory when he was hired, and Puryear's testimony did not refute this. In 1973, however, Bowman hired Jerry Morgan as an industrial salesman in the Mecklenburg County area and Wilson was compelled to transfer industrial accounts to him and did so because, as Wilson testified, "Puryear told me he was going to get me fired if I didn't. I disagreed 100% but I didn't want to get fired." In addition, another Bowman salesman, Ray Gantt, had been hired to solicit orders in at least part of Wilson's territory and according to his testimony, Wilson complained about Gantt in July of 1973 in an effort to get him out of the territory.

3. On August 6, 1973, Bowman salesman John Leroy Julian, Jr. resigned and his five-county territory in South Carolina (Abbeville, Anderson, Greenville, Oconee, and Pickens Counties) became available. At some time in late July or early August, 1973 Wilson and Puryear met to discuss the possibility of Wilson's taking over Julian's territory in South Carolina. The testimony is uncontradicted that Wilson expressed an interest in doing so and that he later did begin to service accounts in Julian's old territory. Wilson and Puryear apparently met on some other occasions regarding the change-

over; Wilson's testimony indicates that Puryear accompanied him during some of his initial calls in the Julian territory. Wilson did agree to a proposal that he give up four North Carolina counties and three South Carolina counties in exchange for the Julian territory; this arrangement would allow him to retain York County in South Carolina and Cleveland, Gaston, and Mecklenburg Counties in North Carolina. According to Puryear, however, the retention of certain accounts in the three North Carolina counties was to last only for one year, for financial security while Wilson established himself in his new territory; Wilson mentioned no such limitation and testified that he certainly would not have taken the new job without retaining the Charlotte, N. C. metropolitan area because 80% of his business was there.[1]

4. On one significant point, the testimony of Puryear and Wilson is directly conflicting. Puryear contends that, during an August, 1973 meeting with Wilson in Charlotte, the two discussed accounts in North Carolina that Wilson would give up and that Wilson marked those accounts with an "X" on a computer printout of the customers serviced by Wilson during the first half of 1973. (Plaintiff's Exhibit 15). Wilson acknowledges that the meeting took place but specifically denies that he went over such a printout with Puryear or marked any accounts to indicate his willingness to give them up. In view of this conflict in the testimony and the clear evidence of disagreement between Wilson and Puryear for some time after the August, 1973 meeting, the court cannot find that plaintiff's Exhibit 15 establishes the existence of any agreement between Wilson and Bowman as to the accounts included thereon or that the marks and other notations on the printout have any

particular significance which can be proved to be relevant to the issues here.

5. On October 19, 1973 Puryear mailed Wilson a copy of the printout (plaintiff's Exhibit 15) and a letter (defendants' Exhibit K) stating that certain accounts were being transferred from Wilson to the industrial division or to Ken Anderson. At some time later in the fall of 1973 Wilson did provide Puryear with a list of some of his accounts which he would allow Anderson to call on but the evidence does not establish that he agreed to a permanent transfer of any such accounts and his December 31, 1973 memo to Puryear (defendants' Exhibit H) shows that Wilson intended to continue personal calls on a number of these customers because they owed him money or because Anderson had not called on them.

6. In a memo to Wilson dated December 28, 1973 (defendants' Exhibit J) Puryear again referred to the agreement which the October 19 letter and printout purportedly effected. He instructed Wilson not to call on any accounts marked on the printout as transferred. The memo concluded with the following:

I will hold this file open until Jan. 5th and if I have not heard from you by then regarding these accounts I will close the file and instruct Cleveland to have all commissions and any of the accounts involved credited to the salesman to whom the accounts were transferred.

Wilson replied in a memo to Puryear dated December 31, 1973 (defendants' Exhibit H), indicating that he would continue to call on a number of customers which Puryear considered transferred.

7. On February 4, 1974, Wilson executed a "SUPPLEMENTAL AGREEMENT" modifying his territory description by substituting a new description

---

1. Wilson did not in fact receive all of the accounts in Julian's territory; he testified (and his testimony is corroborated by plaintiff's Exhibit 12, a list of Julian's former accounts) that

Puryear met in Greenville with Wilson and Rudy Bowen, another Bowman salesman in S. C., and divided the Julian accounts between the two.

effective December 28, 1973. Bowman's representative executed the same document February 26, 1974. The new territory was described as follows:

TERRITORY DESCRIPTION    EFFECTIVE DATE    12–28–73    TERR. NO. 1056–22

Effective date applies to geographical area and classifications indicated below.

Name    R. F. Wilson                Sales No. 2227        On List Date    8–16–71

### CLASSIFICATIONS ASSIGNED

X  NEW CAR DEALERS    X  OTHER AUTOMOTIVE  X  NON–AUTOMOTIVE

| | | |
|---|---|---|
| Ford | Body Shop | Contractors |
| Chrysler | General Garage | Marine |
| Chevrolet | Service Station | Farm Equipment |
| Other G.M. | Fleets | Communications |
| All Other Dealers | Sanitary Services | Miscellaneous |

### CODE TO IDENTIFY ASSIGNMENT

X — Assigned to this territory                    T — Assigned to another territory

Other territories involved with this territory: _____

General Location:  Western N. C.            Registration: _____
                         Western S. C.

### COUNTIES ASSIGNED

### NORTH CAROLINA

Cleveland
Gaston
Mecklenburg

### SOUTH CAROLINA

Abbeville
Anderson
Greenville,
Oconee
Pickens
York

---

8.  Despite the new territory description quoted above, Puryear's memo to Wilson dated March 1, 1974 (defendants' Exhibit E) stated that Wilson was still calling on accounts he was "not supposed to," i. e. those transferred to Ken Anderson. Wilson's reply dated March 8, 1974 stated that, as Puryear had agreed, he had and would continue to call on accounts that owed him money and had not been contacted by another salesman. On March 11, 1974, however, commission on three Orders (all dated March 1, 1974) were "charged back," or taken from Wilson and given to Ken Anderson. (Defendants' Exhibits D and E). On March 25, 1974, Wilson notified Bowman of his resignation effective immediately because of Bowman's breach of the terms of his contract.

9. Shortly after his resignation, Wilson contacted an official of the Fairmount Motor Products Division of Avnet, Inc. to seek employment and was hired almost immediately. No evidence was presented to the court, however, which would indicate that Avnet, Inc. either conspired to lure Wilson away from his job with Bowman or that Avnet attempted to elicit from Wilson any confidential information obtained during his employment with Bowman.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the instant action by virtue of 28 U.S.C. § 1332 since there is diversity of citizenship between the parties and the amount in controversy exceeds $10,000.

2. It is elementary that a federal district court sitting in South Carolina must apply the substantive law of South Carolina in a diversity case, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including the forum's choice of law rules. *Klaxon v. Stentor Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In South Carolina, the general rule in contracts cases is often stated to be that the law applied will be that of the place where the contract is made and is to be performed. *See, e. g., Murphy v. Equitable Life Assurance Society,* 197 S.C. 393, 15 S.E.2d 646 (1941); *Knight v. Fidelity & Cas. Co. of N. Y.,* 184 S.C. 362, 192 S.E. 558 (1937). It is unnecessary in this case, however, to explore the intricacies of determining where the place or places of making and performance are located. South Carolina also adheres to the view that the parties to a contract are to be afforded some latitude in selecting the law that is to govern their dealings. In *Livingston v. Atlantic Coast Line R. Co.,* 176 S.C. 385, 180 S.E. 343 (1935), the court stated:

> It is fundamental that unless there be something intrinsic in, or extrinsic of, the contract that another place of enforcement was intended, the lex loci contractu governs. If the contract be silent thereabout, the presumption is that the law governing the enforcement is the law of the place where the contract is made.

> "The act of the parties in entering into a contract at a particular place, in the absence of anything shown to the contrary, sufficiently indicates their intention to contract with reference to the laws of that place; hence the rule as it is usually stated is that a contract as to its validity and interpretation is governed by the law of the place where it is made, the lex loci contractus; or more accurately, that contracts are to be governed as to their nature, validity and interpretation by the law of the place where they are made, unless the contracting parties clearly appear to have had some other place in view." 13 C.J. 248.

This view is widely-held and is generally in conformity with that of the Restatement (Second) of Conflict of Laws § 187 (1971). In this case, the result is therefore that the court must give effect to the parties' agreement, as embodied in the contract, that the contract "shall be construed in accordance with the laws of Ohio."

3. It is the conclusion of the court that the restrictive covenant which Bowman now seeks to enforce is generally a reasonable one, sufficiently limited in time and space and necessary for the protection of the employer in a business in which an individual salesman's rapport with his customers is all-important. As such, the covenant would be enforceable, under ordinary circumstances, in a court of equity either under Ohio or South Carolina law. *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (1975); *Extine v. Williamson Midwest, Inc.,* 176 Ohio St. 403, 200 N.E.2d 297 (1964); *Briggs v. Butler,* 140 Ohio St. 499, 45 N.E.2d 757 (1942); *Eastern Business Forms v. Kistler,* 258 S.C. 429, 189 S.E.2d 22 (1972); *Standard Register Co. v. Kerrigan,* 238 S.C. 54, 119 S.E.2d 533 (1961) (construing Ohio law).

4. In *Standard Register Co. v. Kerrigan, supra,* the South Carolina Su-

preme Court considered the validity of a restrictive covenant in a case which involved a salesman of business forms. The covenant there was essentially identical to the one in the Bowman-Wilson contract and the parties had specified the application of Ohio law. The court in *Kerrigan* found the covenant reasonable and ordered that it be enforced by an injunction. The opinion made it quite clear, however, that a prerequisite to the enforcement was the court's conclusion that enforcing the covenant would be consistent with the public policy of South Carolina. As the court held:

> The contract with which we are here concerned provides that it shall be construed according to the law of the State of Ohio, but if it is invalid under the law of the State where it is to be performed and contrary to our public policy, we will not enforce it. *Davis v. Jointless Fire Brick Co.,* 9 Cir., 300 F. 1. In the case of *Wiggins v. Postal Telegraph Co.,* 130 S.C. 292, 125 S.E. 568, 44 A.L.R. 781, this Court said:
>
> > "We know of no principle of law based upon comity or interstate commerce transactions, which would require a state court to recognize the validity of a contract which under its laws is declared to be against public policy, immoral and void. *(Building & Loan) Association (Columbian) v. Rice,* 68 S.C. 236, 241, 47 S.E. 63; 2 Kent, Comm., 458; *Thornton v. Dean,* 19 S.C. 583, 587, 45 Am.Rep., 796; 3 A. & E. Enc. Law., 561."

In the case of *Grant v. Butt,* 198 S.C. 298, 17 S.E.2d 689, 693, this Court said:

> "It seems to be well established in this State that contracts having for their object anything that is obnoxious to the principles of the common law, or contrary to statutory enactments or constitutional provisions, or repugnant to justice and morality, are void; and that the Courts of this State will not lend aid to the enforcement of contracts that are in

violation of law or opposed to sound public policy. *Magwood v. Duggan,* 1 Hill, 182; *Craig v. U. S. Health & Accident Ins. Co.,* 80 S.C. 151, 61 S.E. 423, 18 L.R.A.,N.S., 106, 128 Am.St.Rep., 877, 15 Ann.Cas., 216." 119 S.E.2d at 541–42.

It is a universal maxim that covenants not to compete and similar restrictive covenants are to be strictly construed and enforced only under certain circumstances because they constitute restraints upon trade and contracts in general restraint of trade are contrary to public policy. Here, defendants urge the court to scrutinize the restraint involved and the circumstances surrounding it and to deny plaintiff's request for equitable relief in the form of an injunction because Bowman itself had breached the very contract with Wilson which it now seeks to enforce.

Defendants have cited in their brief cases from various jurisdictions which hold that an employer who has breached the terms of an employment contract may not invoke equitable remedies to enforce a non-competition covenant contained in the contract. *See, e. g., SCM Corp. v. Triplett Co.,* 399 S.W.2d 583 (Tex.Civ.App.1966). See Am.Jur.2d, Monopolies, Section 570, and cases collected in annotation appearing at 155 A.L.R. 652 entitled *Restrictive Clause In Employment Or Sales Contract To Prevent Future Competition Or Performance Of Services For Others As Affected By Breach By Party Seeking To Enforce It, Of His Own Obligations Under The Contract.*

Taking away and reassigning of customers or territory is such a breach of the Salesman's Agreement as would preclude enforcement of the restrictive covenant. *Public Laundries, Inc. v. Taylor,* 26 S.W.2d 1085 (Tex.Civ.App.1930). In the *Taylor* case, the defendant had been hired to serve a designated territory by calling for and delivering laundry for a salary plus a commission on all business handled. The written contract specifically described the territory given to the defendant. The Court declined to en-

force the terms of a restrictive covenant in the contract because

> The undisputed evidence showed that appellant took from appellee, without his consent, a part of the territory assigned to him by the contract, and that such act on the part of appellant would materially lessen appellee's ability to earn the commissions contracted for.

> The court, we think, was justified in concluding that appellant had in a material particular breached the contract and that by reason of such breach it was not entitled to have the terms of the contract enforced upon appellee by a court of equity.

26 S.W.2d, at 1087.

■ There appear to be no decisions in South Carolina, or in Ohio for that matter, which squarely hold that an employer who breaches his contract cannot later enforce against an ex-employee a restrictive covenant contained therein. For several reasons, however, it is the conclusion of this court that such a principle is a part of the law of South Carolina and that the South Carolina Supreme Court would so hold if it were faced with the facts and circumstances of this case.

■ The language from *Kerrigan* quoted above indicates that a court of equity in South Carolina must decline to enforce an unreasonable covenant which unjustifiably restrains trade in contravention of local public policy, notwithstanding the fact that it would be acceptable in another state whose law the parties have selected to govern their dealings. In *Kerrigan* the court directed its attention and its opinion toward the reasonableness of the covenant in terms of duration, extent of territorial restriction, and necessity. A court may, however, be asked to enforce a covenant in a somewhat different context, as the court is here, but *Kerrigan* clearly requires that enforcement be effected only when the covenant is reasonable and consistent with sound public policy. Courts of equity, of course, must consider each case in light of its own peculiar facts and

circumstances and is bound to scrutinize *all* the facts relevant to its decision; thus, the reasonableness of a covenant such as the one here is never determined merely from the language which comprises it but rather from the nature and position of the parties and from the entirety of their dealings with each other. To defer to the concern for sound public policy mandated by *Kerrigan,* it seems imperative that this court recognize that a covenant otherwise reasonable in form and scope may become unreasonable and unenforceable when enforcement is sought by a party who has breached the very contract which contains the covenant.

■ In this light, there is a clause contained in the Bowman-Wilson contract whose significance must be evaluated. Its language is as follows:

> The covenant on the part of the Salesman is of the essence of this agreement; it shall be construed as independent of any other provision in this agreement, and the existence of any claim or cause of action of the Salesman against the Company, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant.

If given full effect, the above clause would allow Bowman to enforce the restrictive covenant against Wilson in a court of equity regardless of any conduct by Bowman, however unconscionable or shocking, which had operated to the detriment of Wilson. It is true that parties are generally free to contract as they wish and to select the law of a particular forum as applicable to their contract; they obviously are not, however, empowered to alter by their own agreement principles which have guided courts of equity for generations. The mere presence of the above clause in the Bowman-Wilson contract cannot prevent this or any other court in South Carolina from exercising its equitable jurisdiction consistently with the common law of South Carolina.

■ This conclusion is supported by the presence of two other long-standing equitable doctrines which, although never applied to the specific situation presented here, do govern the deliberation of South Carolina courts in all matters of equity. The doctrines that "He who seeks equity must do equity" and that "He who comes into equity must come with clean hands" are firmly established in South Carolina as applicable to any of the multitude of matters which may arise in equity. *See, e. g. Mayfield v. British & Am. Mfg. Co.,* 104 S.C. 152, 88 S.E. 370 (1916); *Taff v. Smith,* 114 S.C. 306, 103 S.E. 551 (1920); *Shumaker v. Shumaker,* 234 S.C. 421, 108 S.E.2d 682 (1959); *Berry v. Caldwell,* 121 S.C. 418, 114 S.E. 405 (1922); *Whitlock v. Creswell,* 190 S.C. 314, 2 S.E.2d 838 (1939); *Masonic Temple v. Ebert,* 199 S.C. 5, 18 S.E.2d 584 (1942); *Arnold v. City of Spartanburg,* 201 S.C. 523, 23 S.E.2d 735 (1943). These cases do require that the inequitable conduct by the plaintiff of which defendant complains must have occurred in connection with the transaction at issue, but that requirement is clearly met in this case.

It is the conclusion of the court that, should Bowman be found to have breached its contract with Wilson in the manner alleged by defendant, the proper exercise of equitable jurisdiction requires that Bowman be barred from securing the enforcement in equity of the restrictive covenant contained in that same Bowman-Wilson contract.

■ 5. The question of whether Bowman violated its contract with Wilson must be determined according to Ohio law, which the parties agreed would govern the construction of their contract. The terms of the contract are fairly clear, however, and the primary task of the court in ascertaining whether Bowman breached the contract is a factual rather than legal exercise. One significant legal inquiry must be made as to whether Ohio adheres to the doctrine established in South Carolina that the execution of a written contract between two parties is presumed to effect the merger of all prior negotiations between them into the written contract as a final and complete expression of the agreement between them. None of the parties has presented any Ohio authority on this question, but the determination of the court is that Ohio does appear to follow the merger doctrine outlined above. *Burket v. Claypool,* 39 N.E.2d 873 (Ohio App.1941); *Pettett v. Cooper,* 62 Ohio App. 377, 24 N.E.2d 299 (1939).

■ The pattern of the relationship between Bowman and Wilson is reasonably clear in this case. From all the terms of the contract, including the territory description and sales manual incorporated by reference, it is fair to say that Wilson was guaranteed that he would represent Bowman exclusively in his assigned territory and that such guarantee was a substantial inducement for his agreement to work for Bowman. Each of the salesman's agreements contained the provision heretofore quoted makes the salesman Bowman's "exclusive sales representative" for "the accounts assigned to the territory in the aforesaid territory description." The territory description specified categories of accounts in designated counties. The plain meaning of the contract and territory description is that the categories of accounts belong exclusively to the salesman assigned those categories and those counties. When he was hired, Wilson was the sole salesman with respect to those categories of accounts in the specified territories. The provision is further amplified by the memo to new salesmen which was delivered with the initial contract which states "One inflexible rule regarding territories assigned by this company is that each salesman has complete right to the accounts specified on his territory description sheet."

Following Wilson's employment and a period of successful sales representation for Bowman, however, Wilson's position with the company began to be altered. Over his objection, additional salesmen were introduced into his territory and accounts were unilaterally "reclassified"

and taken away from him. When an apparently attractive opportunity to change his territory arose, Wilson agreed to give up some counties and take on new ones. The negotiations concerning his change in the fall of 1973 were inconclusive, however, and Wilson was told that he would have to give up certain accounts in counties which were clearly assigned to him under the as yet unaltered territory designation in his original contract. Moreover, when Wilson did in fact move into his new territory in South Carolina, he eventually did not receive all the commercial accounts located in those counties because some were assigned to another salesman.

When Wilson and Bowman agreed on a new territory description effective December 28, 1973 to be substituted for the old one in his contract, this written agreement, under Ohio law, presumptively incorporated all the prior negotiations which had taken place between the parties to it. Despite their prior disagreement, Wilson and Bowman both executed a document which is clear on its face. Wilson signed the territory description agreement February 4, 1974 and Bowman's representative signed it February 26, 1974 but it made the new territory assignment effective December 28, 1973. After it became effective, the events of March 1 through March 11, 1974 occurred, with the result that commissions were "charged back" or taken away from Wilson and credited to Ken Anderson. These commissions were the product of sales by Wilson to accounts which the territory description effective December 28, 1973 clearly assigned exclusively to Wilson and which had also been assigned to Wilson under the terms of his previous territory description.

The change back incident ultimately precipitated Wilson's resignation effective March 25, 1975.

The evidence presented to the court and the facts as previously found in this order compel the conclusion that Bowman engaged in a pattern of activities which breached the terms of its written contracts with Wilson. No evidence presented indicates that Bowman has established the existence of any other clear *agreement* between Bowman and Wilson at any time other than that which is embodied in the terms of the written contracts. It is therefore the conclusion of the court that Bowman indeed breached the terms of its contract with Wilson to such a degree that it is not entitled to a decree in equity enjoining Wilson from violating a restrictive covenant contained in the same contract breached by Bowman.

6. Since the covenant in question here is not enforceable against Wilson, the issue of Avnet, Inc.'s relationship with Wilson and possible liability to Bowman need not be explored further. Nevertheless, it is the conclusion of the court that Avnet engaged in no activities in connection with its employment of Wilson which could give rise to any liability on its part to the plaintiff under the allegations of this complaint.

### CONCLUSION

Since plaintiff has failed to establish that it is entitled to the injunction it seeks or to any other relief prayed for at the hands of this court, there can be no recovery. The Clerk shall enter judgment for the defendants.

AND IT IS SO ORDERED.