Genex v. Bujnevicie                    CV-00-120-M    07/17/00   P

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Genex Cooperative, Inc.


        v.                                Civil No. 00-120-M
                                          Opinion No. 2000 DNH 153
Jacqueline Bujnevicie


_____

_____                **REPORT AND RECOMMENDATION**


The plaintiff, Genex Cooperative, Inc., ("Genex") brings the underlying action against its former employee, Jacqueline Bujnevicie.  The action is premised on Bujnevicie's alleged breach of a restrictive covenant not to compete with Genex.  Plaintiff's motion for preliminary injunction (document no. 2) has been referred to me for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1)(B).  For the reasons stated below, I recommend that the preliminary injunction be denied.

Background

Genex is a Wisconsin corporation in the business of providing semen and artificial insemination services to dairy and beef producers.  Genex serves more than twenty-two thousand farms

nationwide. To market and deliver its products and services to

herd owners, Genex employs technicians who directly serve these farmers. Because of the nature of this business, farmers become particularly loyal to those technicians that serve them successfully.

On November 27, 1989, in consideration of training, compensation, and benefits offered to Bujnevicie as part of her employment, she entered into a written, technician agreement (the "Agreement") with Eastern Artificial Insemination Cooperative, Inc., a company that has since assigned its rights and obligations to Genex through a merger. According to the Agreement, Eastern agreed to employ Bujnevicie "subject to the current employment policies and practices of Eastern," subsequent revisions, and specific terms as set forth in the Agreement. Plaintiff's Exhibit 2. In turn, Bujnevicie agreed to be bound to a number of conditions including a covenant not to compete. Specifically, this covenant provided that while Bujnevicie was employed as an insemination technician and "for a period of one

year after termination of [her] employment for any reason whatsoever, [s]he will not, directly or indirectly, either as an employee of any organization, corporate or otherwise, or of any individual or as an independent contractor, engage in either the artificial insemination of cattle or the sale of semen in the area in which [s]he has been employed and rendered service." Plaintiff's Exhibit 2. The Agreement also provided that if the the non-compete covenant was violated, (1) Eastern would enforce it by seeking injunctive relief and (2) as liquidated damages Bujnevicie would have to pay Eastern $10.00 per day for each day that she violated the covenant. See Plaintiff's Exhibit 2. Finally, the Agreement provided that upon termination of the agreement by either party, the provisions of the restrictive covenant would remain in full force and effect. See id.

After forming the Agreement, Eastern trained Bujnevicie.[1]

---

[1]Clifford Allen, one of Genex's associate vice presidents for marketing, testified that the initial training for insemination technicians consists of a two week training period in which trainees learn the biological basis of their services and the actual mechanical procedure on how to inseminate cattle. According to Allen, after this initial training, Genex periodically updates the training of its technicians every three

3

As a result, from 1990 through the end of 1999, Bujnevicie worked as an insemination technician for Eastern and, after the merger, for Genex, in southwestern New Hampshire and southern Vermont. During that time Bujnevicie served forty-five herds of approximately eighty herds within her territory. As a Genex technician Bujnevicie was very successful at breeding cows with a seventy percent conception rate. As a result, Bujnevicie was highly regarded by Genex and its customers and developed a substantial market for Genex's products and services in her territory.

Bujnevicie's salary with Genex was determined by the quantity of semen units sold and the number of insemination procedures performed in a given period. Because approximately forty percent of the farms that Bujnevicie serviced for Genex preferred semen from sources other than Genex, most of Bujnevicie's salary came from her breeding services.[2]

to six months.

[2]Although paragraph two of the written contract states that technicians may only service Eastern/Genex customers with Eastern/Genex semen, see Plaintiff's Exhibit 2, according to

To emphasize semen sales--the most profitable sales for Genex--at the end of 1998 Genex changed how it would compensate technicians for their breeding services.  The new payment system resulted in almost a fifty percent decrease in the amount that technicians received for their breeding fees.[3]  In addition, the new payment scheme imposed an allocation fee of $3100 per month for each territory.[4]  These changes imposed a heavy burden on technicians in low growth territories like Bujnevicie's where the total number of herds was limited because these technicians needed to make a lot of semen sales to make it feasible to remain in this line of work.

Genex paid Bujnevicie a transition rate between 1999 to 2000.  In addition, to help prevent her income from declining,

---

Bujnevicie, this provision of the contract never applied to Bujnevicie during her period of employment.

[3]According to Bujnevicie, based upon the new payment system, she made roughly $3.00-3.50 per cow for her breeding services; under the old payment system she made $6.00 per cow.

[4]Previously, the allocation charge had been applied in more of a sliding scale manner so that territories with large herd numbers were primarily responsible for this charge.

Bujnevicie worked at least fifty more days in 1999 than she did in 1998, working all but seven days in 1999. With Genex's new rate of pay, despite the transition rate[5] and the increased number of days worked, Bujnevicie's salary decreased from approximately $49,000 in 1998 to $44,000 in 1999.[6]   On or about January 20, 2000, Bujnevicie proposed to Genex that she would like to continue to represent Genex as an independent contractor rather than an employee. After several discussions regarding this proposal, on February 14, 2000, Genex informed Bujnevicie that it would not agree to this proposal. As a result, Bujnevicie informed Genex at that time that she would no longer work for them. Since that time, under the name of "Twin State Breeder Service" Bujnevicie continues to provide insemination services to customers that she had serviced while she worked for Genex.

---

[5]The transition rate accounted for $4000 of Bujnevicie's $44,000 salary in 1999.

[6]Some of the decrease was also attributed to an overall decrease in Bujnevicie's services and the quantity of semen that she sold in 1999 compared to 1998.

6

Seeking to enforce the restrictive covenant, Genex filed suit in this court on March 17, 2000. The parties appeared before me for an evidentiary hearing on April 7, 2000.

At the hearing Bujnevicie testified that when Robert Schulerud, the regional sales manager in Bujnevicie's territory, explained the new payment scheme to her, she told him that she did not agree with this new method of payment. He responded by telling Bujnevicie that he understood her position. In addition, he intended to put Bujnevicie in contact with a Rhode Island Genex technician who, placed in similar circumstances, stopped working for Genex, but continued to provide her services independent of Genex.

Bujnevicie also testified that she is a single parent with two, young children, ages seven and nine, who accompany her on the job. Although she has worked as a herdsperson in the past, performing this job as a single parent would be very difficult.[7] For the past three years Bujnevicie has worked between 4-10 hours

---

[7]Bujnevicie testified that a herdsperson frequently performs his or her duties, like milking, early in the morning and late at night.

per week, earning approximately $2000 per year, with a local large animal veterinarian, Dr. Steven Major.[8]  Based on her limited responsibilities in this position Bujnevicie does not believe that she could increase her hours in this job.

Major testified that he is familiar with Bujnevicie's services and many of the large herds that Bujnevicie has serviced for Genex.  Major also testified that the national average conception rate in herds is forty percent--far below Bujnevicie's conception rate of seventy percent--and the success of dairy farms depends on an adequate conception rate.[9]  If conception rate drops off with the use of breeding services, farms in Bujnevicie's territory will have to spend more money on breeding

---

[8]When necessary Bujnevicie also takes her children to work with her at this job.

[9]According to Major, because a cow makes most of her milk within three to four months after she has a calf, she is most profitable early in her lactation.  This means that the more frequently a cow is bred the more high producing intervals exist within a cow's life span.  Thus, productivity depends on a successful conception rate.  In addition, if a cow is not bred successfully within four months after giving birth, she will make too little milk, will be shipped for beef and the farmer will have to pay approximately $1200 for a replacement cow.

by using hormones or purchasing a bull.[10]  According to Major, if Bujnevicie is forced to stop providing her services, this would pose an unreasonable hardship on the dairy farmers in her territory.  He also believes that less than half of the farmers in Bujnevicie's territory would use a replacement, Genex technician, because the majority of these farmers would opt for an alternative method to breed their cows.

Schulerud testified that many of Genex's previous customers in Bujnevicie's territory have refused to use Genex's breeding services since Bujnevicie quit in February of this year.  As a result, the Genex technician who has replaced Bujnevicie, Tom Ainsworth, has had difficulty servicing these customers with almost a total loss of business in that territory.

Sheldon Sawyer, a New Hampshire dairy farmer who has used Bujnevicie's breeding services for the past ten years, testified that Bujnevicie is the best technician that he has ever had.  Unlike other technicians, she is willing to catch cows that need

---

[10]Using a bull to breed cows is less desirable because breeding is reduced and bulls are dangerous, unpredictable animals that threaten the safety of others on the farm.

9

to be bred and this is very important to his farm. In addition, Bujnevicie's success at breeding his cows has played a valuable role in maintaining the supply of calves to be sold and milk produced on his farm. If Bujnevicie can no longer provide her services to his farm, Sawyer will use a bull to breed his cows rather than another Genex technician for two main reasons. First, based on his past experience with other technicians and Genex's replacement, Ainsworth, Sawyer has not found their breeding services satisfactory. In addition, he fears that based on the small number of herds in Bujnevicie's territory, at some point it will not be economically feasible for Genex to provide breeding services to this area and Genex will discontinue its breeding services like Eastern did in a neighboring area in the past.

Jay Hamilton, a Vermont dairy farmer who has also used Bujnevicie's breeding services for years, testified that despite a high herd number, the conception rate on his farm has been

10

excellent because of Bujnevicie's efforts.[11]  He testified that part of the reason why Bujnevicie is so successful is because she knows the cows as well as he does and is willing to make sure that cows get serviced when it is time for them to be bred.  If Bujnevicie is unable to service his cows, he is likely to service his own cows rather than use another technician from Genex.  This is because like Sawyer, Hamilton doubts the competency of other Genex technicians and he is afraid that Genex will drop its breeding services in his area.  According to Hamilton, breeding of his cows is the most important aspect of his farm and like other farmers in the area he is concerned that the profitability of his operation will decline if Bujnevicie is not allowed to continue to service his farm.

Discussion

1.    Preliminary Injunction Standard

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the

---

[11]High herd numbers usually cause conception to decrease because of additional stress put on cows in large herds.

11

trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995)(citing Chalk v. United States Dist. Court Cent. Dist. of California, 840 F.2d 701, 704 (9th Cir. 1988); American Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)). Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused by defendants. See 13 James Moore et al., Moore's Federal Practice §65.02 (3d ed. 1998).

In determining whether to grant a preliminary injunction, this court considers four factors. See Legault v. aRusso, 842 F. Supp. 1479, 1485 (D.N.H. 1994). The four factors are: "(1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the `hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld,' Narragansett Indian Tribe

v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); and (4) the effect on the public interest of a grant or denial of the injunction." Gately v. Massachusetts, 2 F.3d 1221, 1224 (1st Cir. 1993); see Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995); Sunshine Development, Inc. v. F.D.I.C., 33 F.3d 106, 110 (1st Cir. 1994); Aoude v. Mobil Oil Corp., 862 F.2d 890, 892 (1st Cir. 1988). The sine qua non of a preliminary injunction is the likelihood of success on the merits; the court may deny the motion if the movant does not show that it will probably succeed on its claims. See Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993).

## 2. Likelihood of Success on the Merits

Genex alleges that Bujnevicie, by continuing to provide breeding services to Genex's previous customers, is engaging in activities in violation of the non-compete covenant in her employment agreement with Genex. See Plaintiff's Motion for Preliminary Injunction (document 2).

In response, Bujnevicie asserts that the restrictive covenant should not be imposed upon her because it would result

13

in undue hardship to both her and the farms that she services. See Defendant's Objection to Plaintiff's Motion for Preliminary Injunction (document 6) at 1-2.  In addition, Bujnevicie alleges that by unilaterally altering her method of compensation in a manner that significantly decreased her income and forced her to resign, Genex breached its employment contract with her.  See id. at 2.  As a result of this prior breach by Genex, Bujnevicie alleges that she should not be bound by the non-compete covenant. See id.

Because I agree that Genex breached its employment agreement with Bujnevicie by significantly decreasing her salary, Genex cannot enforce other terms of the Agreement, such as the non-compete covenant, against Bujnevicie.  I find this for several reasons.  First, "an employment contract implies an obligation on the part of an employer to afford a certain degree of financial security to the contracting employee ... " Laconia Clinic, Inc. v. Cullen, 119 N.H. 804, 806, 408 A.2d 412, 413 (1979).  In addition, "a restrictive clause in an employment contract preventing future competition by the employee may not be enforced

14

where there has been a [material] breach by the employer of his own obligations under the contract."  Id. at 807 (citations omitted); see also Associated Spring Corporation v. Roy F. Wilson & Avnet, Inc., 410 F. Supp. 967 (D.S.C. 1976)("employer who breaches his contract cannot later enforce against an ex-employee a restrictive covenant"); Smith-Scharff Paper Company v. Blum, 813 S.W.2d 27 ((Mo. App. 1991)(materially altering employee's salary after employee agreed to a non-compete covenant resulted in a unilateral breach by the employer of the employment agreement); Forms Manufacturing, Inc. v. Edwards, 705 S.W.2d 67, 69 (Mo. App. 1985)("A party to a contract cannot claim its benefits where he is the first to violate it.").

Although the terms of Bujnevicie's salary were not expressed in the Agreement, it is obvious that, like the plaintiffs in Laconia Clinic, Smith-Scharff, and Forms Manufacturing, Bujnevicie agreed to terms within that document, such as the restrictive covenant, in exchange for a method of compensation that provided her with financial security.  It is also clear that in 1999 Genex unilaterally altered its payment scheme in a way

15

that substantially reduced Bujnevicie's salary. For instance, under Genex's new payment plan, Genex reduced the forty per cent portion of Bujnevicie's income that was derived soley from breeding services by fifty per cent--compensating Bujnevicie just $3.00 per cow instead of $6.00 per cow. In addition, it is clear that Bujnevicie did not agree to this alteration. As soon as Genex explained the new payment scheme to Bujnevicie, (1) she did not find it acceptable, (2) she informed Genex that this payment scheme would not work for her, (3) Genex understood her position, (4) Genex implemented a transition rate for her in 1999 to alleviate some of the strain the new payment plan had on her income, and (4) Schulerud communicated to her that he intended to put her in contact with a previous Genex technician who, placed under similar circumstances left Genex to work as an independent technician.

Under the new payment plan, but while the transition rate was in place, Bujnevicie worked for Genex for another year, attempting to increase her semen sales and taking very little time off. However, after a year of her efforts Bujnevicie still

16

could not accept the new payment plan because her salary was too low under this plan. Despite the $4000 attributed to the transition rate in 1999 and the significant increase in the number of days that she worked in 1999, Bujnevicie's salary still decreased from $49,000 in 1998 to $44,000 in 1999. As a result, in January of 2000, Bujnevicie attempted to convince Genex to hire her as an independent contractor. After she realized that Genex would not agree to such an arrangement in mid-February of 2000, she terminated her position with Genex.

In light of these events, I find that Genex materially breached its employment obligations when it unilaterally and materially reduced Bujnevicie's salary. As a result, Bujnevicie should not be bound by the restrictive covenant in the Agreement.[12]

## 3. Irreparable Harm

The second factor relevant to the issuance of a preliminary

---

[12]This result is also consistent with New Hampshire law that enforces restrictive covenants only "if reasonable as applied to the particular circumstances of the parties." Concord Orthopaedics Professional Association v. Forbes, 142 N.H. 440, 442, 702 A.2d 1273, 1275 (1997).

injunction is irreparable harm.  Genex claims that it has a legitimate interest in preventing its employees from appropriating the "goodwill" established by the employer, <u>see</u> Plaintiff's Supplemental Memorandum in Support of a Preliminary Injunction at 6 (document 11), and Bujnevicie's "repeated and widespread violation of the non-compete provision in her Agreement with Genex" has caused and continues to cause Genex irreparable harm.  <u>See</u> Plaintiff's Motion for Preliminary Injunction at 9.

It is true that an employer has a legitimate interest in preventing an employee from appropriating goodwill that has been established through the employee's contact with its customers, <u>see</u> <u>Technical Aid Corporation v. Allen</u>, 134 N.H. 1, 9, 591 A.2d 262, 266 (1991), and this misappropriation can irreparably harm the employer.  However, the hardship that is being suffered by Genex at this time--the near total loss of business in Bujnevicie's area--is a product of Genex's own doing.  Genex drastically reduced Bujnevicie's salary to a point that made it unfeasible for her to continue to work for Genex as an employee.

18

When Bujnevicie attempted to compromise with Genex by working as an independent contractor promoting the sale of Genex semen, it declined to do so.  In addition, even if the covenant were imposed upon Bujnevicie for the one year period, it is quite likely that less than half of Genex's customers would obtain services from Genex again.  According to the testimony at the hearing, many of Genex's previous customers would either inseminate the cows themselves or buy a bull to breed their cows if Bujnevicie is not allowed to service them.  This is not only because farmers in Bujnevicie's territory are unsatisfied with other Genex technicians who lack Bujnevicie's skills and efforts, but based on the limited number of farms in the area and the past history of Genex's predecessor, Eastern, these farmers have little faith that Genex can economically sustain a breeding service over the long term.  In other words, the farmers fear that they will be "dumped" by Genex at some point in the near future.  Thus, although Genex has suffered a loss of business in Bujnevicie's territory that has caused it harm, Genex's own actions have played a major role in this harm.

19

## 4. Balance of Hardships

The next factor relevant to the issuance of a preliminary injunction is the balance of hardships. With respect to the balancing of hardships, Genex contends that an injunction should be issued because Genex has made a substantial investment in Bujnevicie's development as a technician which she has abused by demanding to be recognized as an independent contractor and stealing Genex's customers. See Plaintiff's Motion for Preliminary Injunction at 9-10. In addition, Genex claims that Bujnevicie cannot claim hardship if the non-compete covenant is enforced against her because she agreed that (1) the remedy of injunction would be available to Genex and (2) the non-compete covenant would survive any termination of the Agreement. See id.

Based on the testimony at the hearing, although Genex has done some training with Bujnevicie, Genex is hard-pressed to take full responsibility for Bujnevicie's exceptional skills at breeding cows. This is particularly true in light of the farmers' testimony that (1) Bujnevicie performs extra duties for them that other Genex technicians do not, (2) Bujnevicie has been

20

the most successful technician that they have ever had, and (3) when Bujnevicie has not been available they have found the services provided by other Genex technicians unacceptable, sometimes calling Bujnevicie to work on her days off. Major, the veterinarian that works with these farmers, also confirmed that Bujnevicie's skills are exceptional compared to other technicians.

In addition, Bujnevicie was and still is willing to sell Genex products to farms in her territory. Contrary to Genex's suggestion, Bujnevicie's decision to work as an independent contractor was not "out of the blue." Instead, it was in response to the drastic reduction in her salary that resulted from Genex's unilateral change in its employment contract with Bujnevicie.

Although the Agreement states that upon termination of the Agreement by either party that the restrictive covenant "shall remain in full force and effect," Plaintiff's Exhibit 2, this does not mean that the parties are "empowered to alter by their own agreement principles which have guided courts of equity for

21

generations." <u>Associated Spring Corporation</u>, 410 F. Supp. at 977. Thus, the mere presence of the language indicated above in the Agreement cannot prevent this court from exercising its equitable jurisdiction as it sees fit.

Finally, although Bujnevicie may obtain other work as a herdsperson, this line of work, unlike her work as a technician and part-time veterinarian assistant, conflicts with Bujnevicie's responsibilities as a single parent. If Bujnevicie is forced to move away from the area to continue to work as a technician, this would also disrupt her family because she would be moving her children away from their father. Accordingly, I conclude that the balance of hardships weighs against issuance of an injunction.

5.  Public Interest

Finally, in issuing a preliminary injunction, the court must consider the public interest. Genex contends that the public interest is advanced by holding these parties to the terms of their agreement and preventing unfair trade practices performed by Bujnevicie. <u>See</u> Plaintiff's Motion for Preliminary Injunction

22

at 10.

I agree that the parties should be held to the terms of their agreement. However, Genex cannot enforce a term of the contract to its benefit when it has failed to uphold its own obligation to provide Bujnevicie with a compensation method that provides her with financial security. It is contrary to public policy to enforce a restrictive covenant when the party who seeks enforcement has breached its own obligations under the contract. See, e.g., Associated Spring Corporation, 410 F. Supp. at 977; Laconia Clinic, 119 N.H. at 806. In addition, given the evidence presented it is clear that the farmers in Bujnevicie's territory who depend heavily upon a successful breeding program will suffer significant economic consequences if Bujnevicie is prevented from providing services to them. Accordingly, the evidence on the public interest weighs against the issuance of a preliminary injunction.

## Conclusion

I have carefully considered the parties' legal arguments, the testimony by the witnesses, and the various exhibits. I

conclude that a preliminary injunction should not be granted under these circumstances. Plaintiff's Motion for Preliminary Injunction (document no. 2) requesting the court to order Bujnevicie to stop promoting and selling cattle semen products and artificial insemination services in the Genex territory in which Bujnevicie was once employed by Genex should be denied.

Any objections to this Report and Recommendation must be filed within ten days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Committee v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date: July 17, 2000

cc:   Irvin D. Gordon, Esq.
      Arend R. Tensen, Esq.